No. 23-20481

# In the United States Court of Appeals for the Fifth Circuit

RICHARD LOWERY,

*Plaintiff-Appellant,*

v.

TEXAS A&M UNIVERSITY; ANNIE S. McGOWAN; N. K. ANAND; MARK A. WELSH III, INTERIM PRESIDENT OF TEXAS A&M UNIVERSITY; ALAN SAMS,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of Texas
Case No. 4:22-cv-03091

## OPENING BRIEF OF APPELLANT RICHARD LOWERY

GENE P. HAMILTON
Vice-President and General Counsel
America First Legal Foundation
611 Pennsylvania Avenue SE, #231
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

JONATHAN F. MITCHELL
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Plaintiff-Appellant*

# CERTIFICATE OF INTERESTED PERSONS

Counsel of record certifies that the following persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Plaintiff | Plaintiff's Counsel |
|---|---|
| • Richard Lowery | Jonathan F. Mitchell<br>MITCHELL LAW PLLC<br><br>Gene P. Hamilton<br>AMERICA FIRST LEGAL FOUNDATION |

| Defendants | Defendants' Counsel |
|---|---|
| • Texas A&M University<br>• Mark A. Welsh III<br>• Annie S. McGowan<br>• N.K. Anand<br>• Alan Sams | M. Carter Crow<br>Layne E. Kruse<br>Paul Trahan<br>Ryan Meltzer<br>Jesika Silva Blanco<br>NORTON ROSE FULBRIGHT LLP |

| Former Defendant |
|---|
| • M. Katherine Banks |

/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Plaintiff-Appellant*

## Statement Regarding Oral Argument

Plaintiff-appellant Richard Lowery respectfully requests oral argument, as the issues in this case are sufficiently important and complex to warrant oral-argument time.

# TABLE OF CONTENTS

Certificate of interested persons ...................................................................... i

Statement regarding oral argument .................................................................. ii

Table of contents ............................................................................................ iii

Table of authorities ......................................................................................... v

Statement of jurisdiction ................................................................................. 2

Statement of the issues.................................................................................... 3

Statement of the case ...................................................................................... 4

    I.  Texas A&M's discriminatory faculty-hiring practices....................... 4

    II. Plaintiff Richard Lowery ........................................................... 9

    III.The district-court proceedings ................................................. 12

    IV.The district court's ruling....................................................... 24

Summary of argument.................................................................................... 26

Standard of review ........................................................................................ 29

Argument ...................................................................................................... 29

    I.  The district court erred in dismissing Professor Lowery's claims for lack of Article III standing............................................. 29

    II. The district court should have allowed Professor Lowery to take discovery before considering the factual evidence in the defendants' Rule 12(b)(1) motion ........................................................... 39

    III.The district court erred in dismissing Professor Lowery's claims as moot and unripe......................................................... 41

        A. Neither SB 17 nor *Students For Fair Admissions* moots Professor Lowery's claims for prospective relief .................................. 41

        B. Professor Lowery's claims remain ripe ................................. 42

    IV.The district court abused its discretion in denying Professor Lowery's motion for leave to amend his complaint ..................... 45

Conclusion .................................................................................................... 47

Certificate of service ........................................................................ 48

Certificate of compliance ................................................................ 49

Certificate of electronic compliance ....................................................... 50

## Table of Authorities

**Cases**

*Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967) ................................. 42

*Carney v. Adams*, 592 U.S. 53 (2020) ........................................3, 26, 30, 32

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983)..................................32, 35

*Ex parte Young*, 209 U.S. 123 (1908) ........................................................ 45

*Gratz v. Bollinger*, 539 U.S. 244 (2003)............................................passim

*Grutter v. Bollinger*, 539 U.S. 306 (2003) ..................................................6

*International Brotherhood of Teamsters v. United States*,
    431 U.S. 324 (1977)................................................................................ 33

*Los Angeles County v. Davis*, 440 U.S. 625 (1979) ...............................27, 41

*Manhattan Community Access Corp. v. Halleck*, 139 S. Ct. 1921 (2019) ................... 46

*McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273 (1976) ........................ 1

*McLin v. Twenty-First Judicial District*, 79 F.4th 411 (5th Cir. 2023)....................... 29

*Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507 (5th Cir. 1980) .................24, 31, 40

*New Orleans Public Service, Inc. v. Council of City of New Orleans*,
    833 F.2d 583 (5th Cir. 1987)................................................................. 43

*Northeastern Florida Chapter of Associated General Contractors of
    America v. City of Jacksonville*, 508 U.S. 656 (1993) ....................................passim

*Opulent Life Church v. City of Holly Springs*,
    697 F.3d 279 (5th Cir. 2012) ................................................................. 43

*Sossamon v. Lone Star State of Texas*, 560 F.3d 316 (5th Cir. 2009).............. 25, 28, 44

*Speech First, Inc. v. Fenves*, 979 F.3d 319 (5th Cir. 2020) ................................... 28, 45

*St. Germain v. Howard*, 556 F.3d 261 (5th Cir. 2009) ............................................. 29

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard
    College*, 600 U.S. 181 (2023) ........................................................passim

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ........................................ 43

*United States v. W.T. Grant Co.*, 345 U.S. 629 (1953) ............................................. 41

v

*Williamson v. Tucker*, 645 F.2d 404 (5th Cir. 1981) ........................................3, 27, 40

**Statutes**

20 U.S.C. § 1681 ................................................................................. 1, 4, 42

28 U.S.C. § 1291.................................................................................................2

28 U.S.C. § 1331 ................................................................................................2

42 U.S.C. § 1981................................................................................. 1, 6, 12, 43

42 U.S.C. § 2000d ............................................................................... 1, 4, 42

Tex. Educ. Code § 51.3525(b)(1)(D) ...................................................... 13

**Rules**

Fed. R. Civ. P. 15(a)(2) ...................................................................... 28, 46

**Other Authorities**

*Lessons from the Frontlines of the University Wars | Richard Lowery &*
    *Richard Hanania*, CSPI ( July 18, 2022),
    https://www.cspicenter.com/p/41-lessons-from-the-frontlines-of .................... 10

Colleges and universities throughout the United States discriminate on account of race and sex in their faculty appointments by hiring mediocre women and "underrepresented" minorities over white and Asian men who have better credentials, scholarship, and teaching ability. This practice, known as "affirmative action," has become entrenched at institutions of higher learning and is aggressively pushed by left-wing faculty and administrators. But it is prohibited by federal law, which bans universities that accept federal funds from discriminating on account of race or sex in their hiring decisions. *See* 42 U.S.C. § 2000d (Title VI); 20 U.S.C. § 1681 (Title IX).

Texas A&M University is flouting these statutory requirements by using race and sex preferences in faculty hiring and compensation—a practice that violates not only the clear and unequivocal text of Title VI and Title IX, but also 42 U.S.C. § 1981 and the Equal Protection Clause. *See McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 295 (1976) (holding that 42 U.S.C. § 1981 "proscribe[s] discrimination in the making or enforcement of contracts against, or in favor of, any race."); *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181 (2023) ("[T]he Equal Protection Clause applies without regard to any differences of race, of color, or of nationality—it is universal in [its] application." (citation and internal quotation marks omitted)). On September 10, 2022, Professor Richard Lowery sued Texas A&M to enjoin these discriminatory practices, but the district court dismissed Professor Lowery's claims on jurisdictional grounds. The district court held that Professor Lowery lacked Article III standing to

seek prospective relief because he had not yet applied for a faculty appointment at Texas A&M, even though Professor Lowery stands "able and ready" to apply for a position at Texas A&M and submitted a sworn declaration to that effect. ROA.308 (¶¶ 12–15). The district court also held that the recent enactment of Senate Bill 17—a state law that bans public universities from discriminating on account of race and sex in faculty hiring—renders Professor Lowery's claims moot and unripe, even though Professor Lowery claims that Texas A&M has no intention of complying with SB 17 and submitted evidence to support that claim. ROA.401-411; ROA.528-531 (¶¶ 48–58); ROA.572-605; ROA.654-686; ROA.696-711; ROA.742-752.

Professor Lowery respectfully asks this Court to reverse the district court's jurisdictional dismissal and remand for further proceedings.

## STATEMENT OF JURISDICTION

The federal district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because Professor Lowery is alleging violations of federal anti-discrimination law. The parties dispute whether Professor Lowery has Article III standing to seek prospective relief against the defendants, and whether the recent enactment of SB 17 renders his claims moot or unripe. This Court's appellate jurisdiction rests on 28 U.S.C. § 1291 because Professor Lowery is appealing a final judgment. The district court entered its final judgment on September 29, 2023, ROA.782, and Professor Lowery appealed later that day, ROA.783.

## STATEMENT OF THE ISSUES

1.    A litigant has Article III standing to seek injunctive relief against an allegedly discriminatory hiring practice so long as he stands "able and ready" to apply for the relevant job. *See, e.g.*, *Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993); *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003); *Carney v. Adams*, 592 U.S. 53, 60-66 (2020). The district court, however, dismissed Professor Lowery's claims for lack of Article III standing because Professor Lowery had not yet applied for a faculty appointment at Texas A&M and will not do so until Texas A&M scraps its discriminatory hiring practices. Yet the district never denied that Professor Lowery stood "able and ready" to apply, and Professor Lowery submitted a sworn declaration that explained in detail how he was both "able" and "ready" to apply for a faculty position at Texas A&M. ROA.306-310 (¶¶ 3–21). The issue presented is:

> Did the district court err by dismissing Professor Lowery's claims for lack of Article III standing?

2.    The law of the Fifth Circuit requires district courts to afford litigants an opportunity for discovery before granting a "factual" motion to dismiss for lack of subject-matter jurisdiction. *See Williamson v. Tucker*, 645 F.2d 404, 414 (5th Cir. 1981). The district court acknowledged that the defendants had brought a "factual" rather than "facial" challenge to its jurisdiction, ROA.773, yet the district court resolved disputed issues of fact and denied the truth of Professor Lowery's allegations without providing an opportunity

for discovery (even though Professor Lowery asked for it). The issue present-
ed is:

> Did the district court err by resolving issues of fact presented by
> the defendants' Rule 12(b)(1) motion without first affording
> Professor Lowery an opportunity for discovery?

3. Did the district court err in holding that the enactment of SB 17 ren-
ders Professor Lowery's claims moot and unripe?

4. Did the district court abuse its discretion by denying Professor Low-
ery's motion for leave to amend his first amended complaint?

## STATEMENT OF THE CASE

### I.   TEXAS A&M'S DISCRIMINATORY FACULTY-HIRING PRACTICES

Texas A&M University, along with nearly every university in the United
States, discriminates on account of race and sex when hiring its faculty, by
giving discriminatory preferences to females and non-Asian racial minorities
at the expense of white and Asian men. This practice, popularly known as
"affirmative action," leads universities to hire and promote inferior faculty
candidates over individuals with better scholarship, better credentials, and
better teaching ability. These race and sex preferences are patently illegal un-
der Title VI and Title IX, which prohibit all forms of race and sex discrimina-
tion at universities that receive federal funds. *See* 42 U.S.C. § 2000d (Title
VI); 20 U.S.C. § 1681 (Title IX). But university faculty and administrators
think they can flout these federal anti-discrimination statutes because they

are rarely sued over their discriminatory hiring practices and the Department of Education looks the other way.

M. Katherine Banks, who served as president of Texas A&M University when this lawsuit was filed,[1] is a particularly aggressive and enthusiastic proponent of illegal race and sex preferences in faculty hiring. ROA.163 (¶ 12). Before Banks became president of Texas A&M University on June 1, 2021, she served as dean of Texas A&M's college of engineering. ROA.163 (¶ 13). During the spring of 2021, while serving as dean, Banks told faculty senators from the engineering caucus that, until further notice, all new tenure-track hires in the college must be "underrepresented minorities." *See id.* In addition, Banks would regularly give departments new faculty openings that could be filled by only "underrepresented minorities" or women. *See id.*

Banks continued to promote and oversee discriminatory faculty-hiring practices after she ascended to the presidency of Texas A&M. On July 8, 2022, a memo was sent from Texas A&M's "office for diversity" to all deans at the university. The memo was signed by Annie McGowan, the vice president and associate provost for diversity, and N.K. Anand, the vice president for faculty affairs. The memo says:

---

1.  Banks resigned as president of Texas A&M University on July 21, 2023, and was succeeded by Mark A. Welsh III. ROA.691-692. Welsh initially held the title of "acting president" from July 21, 2023, through July 30, 2023. He was named "interim president" on July 30, 2023, and held that title through December 12, 2023. He became the sole finalist for the position of university president and assumed that position on December 12, 2023. He is now the president of Texas A&M University.

Effective July 1, 2021, Texas A&M was officially recognized as a Hispanic Serving Institution (HSI) by the United States Department of Education. As an HSI, Texas A&M is charged with expanding the capacity of low-income, first-generation Hispanic students, and other underserved students and their communities. Increasing opportunities for underserved students to interact and engage with faculty that share their ethnic, life, and cultural experiences are essential to achieving this goal. The presence of faculty of color is also integral to the University's mission to provide the highest quality of undergraduate and graduate education and develop new understandings through research and creativity.

ACES Plus was created to ensure promising faculty to come to Texas A&M. For the FY 23 and FY 24, the VP for Faculty Affairs will allocate a sum of $2 million for the ACES Plus Program. The funds will be used to provide 50% matching base salary and benefits, up to a maximum contribution of $100,000 (salary and fringe) for new mid-career and senior tenure-track hires *from underrepresented minority groups, that contribute to moving the structural composition of our faculty towards parity with that of the State of Texas*. Consistent with our land-grant mission, and as defined NIH policy, Texas A&M defines URMs as African Americans, Hispanic/Latino Americans, Native Americans, Alaskan Natives, and Native Hawaiians.

ROA.163-164 (¶ 15); ROA.177 (emphasis added). Banks is cc'd on this memo of July 8, 2022, as is Timothy Scott, the then-interim provost of Texas A&M University. ROA.178. But setting aside funds to supplement the salaries of faculty from "underrepresented minority groups" violates Title VI, 42 U.S.C. § 1981, and the Equal Protection Clause, as does the memo's self-proclaimed goal of establishing a faculty whose racial composition attains "parity with that of the state of Texas." *See Grutter v. Bollinger*, 539 U.S. 306, 330 (2003) ("[O]utright racial balancing . . . is patently unconstitutional.");

6

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181 (2023) ("[T]he Equal Protection Clause applies without regard to any differences of race, of color, or of nationality—it is universal in [its] application." (citation and internal quotation marks omitted)).

Texas A&M University is also establishing faculty hiring lines that are reserved exclusively for members of "underrepresented" (read: non-Asian) racial minorities. On August 26, 2022, a faculty member at Texas A&M's business school e-mailed Shane A. Johnson, the head of the recruiting committee for the department of finance for the 2022–23 academic year, after hearing that one of the faculty hiring lines in the department of finance was being set aside for an "underrepresented" racial minority. ROA.165 (¶ 20); ROA.179 ("I heard from someone that one of our lines is reserved for an 'underrepresented minority.' Is that correct?"). Later that day, Professor Johnson e-mailed back confirming that this was indeed the case:

> The underrepresented line would potentially be a third position, so yes reserved, but not one of our "regular" positions.

ROA.165 (¶ 21); ROA.179.

The use of discriminatory race and sex preferences in faculty hiring has been enthusiastically embraced by the Texas A&M faculty senate. On October 17, 2022, the faculty senate overwhelmingly adopted a resolution announcing, among other things, that "the university still has significant work ahead to help other underrepresented groups make progress to more ade-

quately reflect Texas of the 21st century." ROA.165-166 (¶ 23) (citing https://youtu.be/NJ2UdG2C2_g?t=6175). The resolution stated:

> Be it resolved: The faculty senate of Texas A&M university reconfirms its commitment to diversity, equity, and inclusion efforts and, be it further resolved, that the faculty senate supports the goals of programs, such as ACES and ACES Plus, that aim to diversify the ranks of faculty to better represent our state and our student body.

*Id.* During the faculty senate meeting, Professor Adam Kolasinski spoke against the resolution and criticized the stated goal in the ACES Plus program to "move the structural composition of our faculty toward parity with that of the state of Texas."[2] Professor Kolasinski pointed out that Asians currently constitute 20% of the Texas A&M faculty but only 5% of the Texas population.[3] So the stated goal in the ACES Plus program would require "the replacement of 2/3 to 3/4 of our Asian faculty solely because of their race."

*Id.* Professor Kolasinski then said:

> If you support this resolution, I ask you, which 3/4 of your Asian colleagues do you want to get rid of? Or do you instead support making most new faculty positions one to which Asians need not apply, for the next decade? By the way, that's what the ACES Plus program does. It creates new faculty positions for which no Asians need apply.[4]

After Professor Kolasinski finished his remarks, Professor Angie Hill Price said: "I am almost speechless. I think that was extraordinarily offen-

---

2.   ROA.166 (¶ 24–25) (citing https://youtu.be/NJ2UdG2C2_g?t=6687).

3.   ROA.166 (¶ 25) (citing https://youtu.be/NJ2UdG2C2_g?t=6732).

4.   ROA.166 (¶ 25) (citing https://youtu.be/NJ2UdG2C2_g?t=6732).

sive."[5] She also said: "I hope that we can help support our DEI initiatives and intent from our university and support the coordinating board initiatives to be able to better represent the people of the state of Texas who are paying for our services and paying taxes to support us."[6] *Id.* No other faculty senator commented on Professor Kolasinski's remarks. The faculty senate then voted 54-12 to endorse the resolution despite Professor Kolasinski's objections.[7]

Professor Hill Price's remarks indicate that there are other "DEI initiatives" and other "coordinating board initiatives," in addition to the ACES Plus program, that are designed to make the demographic makeup of Texas A&M less white and less Asian—or (in the euphemistic words of Professor Hill Price) "to better represent the people of the state of Texas who are paying for our services and paying taxes to support us." And it is evident that the 54 faculty senators who voted to endorse the resolution intend to pursue these goals regardless of whether they are dictated or decreed from on high.

## II.   Plaintiff Richard Lowery

Plaintiff Richard Lowery is a tenured professor of finance at the University of Texas at Austin (UT-Austin). ROA.768. But he is actively looking for employment elsewhere because he is unhappy with the current administration at UT-Austin and has been treated poorly by his colleagues and superiors at the university. ROA.169 (¶ 35); ROA.306 (¶ 4). Professor Lowery has

---

5.   ROA.167 (¶ 26) (citing https://youtu.be/NJ2UdG2C2_g?t=6933).

6.   ROA.167 (¶ 26) (citing https://youtu.be/NJ2UdG2C2_g?t=6933).

7.   ROA.167 (¶ 27) (citing https://youtu.be/NJ2UdG2C2_g?t=7140).

faced retaliation for his criticism of the university administration, especially over its resistance to the proposed Liberty Institute at UT-Austin. ROA.169 (¶ 35); ROA.306 (¶ 5). He sharply criticized the university president in a recent podcast,[8] which triggered an investigation from the university's legal department. ROA.169 (¶ 35); ROA.306-307 (¶ 6). Professor Lowery has also been banned from participating in recruiting for the finance department at UT-Austin because he refuses to attend the "diversity training sessions" that the provost's office mandates for university faculty. ROA.169 (¶ 36); ROA.307 (¶ 7). And he is disillusioned with the rising crime rates in Austin caused by the city's failure to address the homelessness situation, and wants to find an appointment in a location that does not put his family's safety at risk. ROA.170 (¶ 37); ROA.307 (¶ 8).

Professor Lowery has already applied for a faculty appointment at the University of Florida, where he has been intrigued by the recently approved Hamilton Center for Classical and Civic Education, which is similar to the Liberty Institute that was unsuccessfully proposed at UT-Austin, and where the university system appears more serious about improving leadership, as demonstrated by the recent hiring of former Senator Ben Sasse as president. ROA.170 (¶ 38); ROA.307 (¶ 9).

---

8.   Professor Lowery stated during the podcast that "the sole qualification for being president of a university in a red state is being good at lying to Republicans." *See Lessons from the Frontlines of the University Wars | Richard Lowery & Richard Hanania*, CSPI (July 18, 2022), https://www.cspicenter.com/p/41-lessons-from-the-frontlines-of.

Professor Lowery is especially interested in applying for a faculty appointment at Texas A&M, because he prefers to remain in Texas due to the favorable income-tax environment but would like to move away from major metropolitan areas. ROA.170 (¶ 39); ROA.307 (¶ 10). He has good relationships with some of the faculty members in the finance department at the Mays School of Business and believes that he could integrate quickly into that department. ROA.170 (¶ 39); ROA.307 (¶ 10). Texas A&M is also one of the few universities in the United States where some departments might consider hiring an outspoken conservative at Professor Lowery's career stage, which makes Texas A&M one of his best options for alternative employment. ROA.170 (¶ 39); ROA.307 (¶ 10). Professor Lowery also prefers to seek employment at public universities in Texas and Florida because he sees some hope that the leadership of these states might have the political will to restore unfettered academic inquiry as the goal of the university, reversing the movement toward social-justice activism. ROA.170 (¶ 40); ROA.308 (¶ 11).

Professor Lowery, although he stands "able and ready" to apply for a faculty appointment at Texas A&M, will not do so until he can compete on an even playing field with female faculty candidates and faculty candidates of other races. ROA.170-171 (¶ 41); ROA.308 (¶ 12). Professor Lowery would have already applied for a faculty position at Texas A&M were the university not using these discriminatory hiring practices. ROA.171 (¶ 41); ROA.308 (¶ 12). Indeed, Professor Lowery is actively assisting efforts at Texas A&M University to establish something akin to the Liberty Institute that failed to

win approval at UT-Austin. ROA.171 (¶ 42); ROA.308 (¶ 13). And in April of 2022, Professor Lowery gave an informal lunch talk to the finance department at Texas A&M's Mays Business School in the hopes of generating interest from the department in a possible future appointment. ROA.171 (¶ 43); ROA.308 (¶ 14). So Professor Lowery has a keen interest in the mission of Texas A&M and will apply for a faculty position once the university scraps its illegal and discriminatory hiring preferences. ROA.171 (¶ 42); ROA.308 (¶ 13).

## III. The District-Court Proceedings

On September 22, 2022, Professor Lowery filed a class-action lawsuit against Texas A&M University and its officials, claiming that the university is violating Title VI, Title IX, 42 U.S.C. § 1981, and the Equal Protection Clause by discriminating in favor of women and non-Asian racial minorities in its faculty-hiring decisions. ROA.13-24.[9] After the defendants moved to dismiss, Professor Lowery filed an amended complaint with detailed factual allegations of Texas A&M's discriminatory faculty-hiring practices and Professor Lowery's standing to sue. ROA.161-179.[10]

---

9.  On October 7, 2022, Professor Lowery moved to certify a plaintiff class of all white and Asian men who currently stand "able and ready" to apply for faculty appointments at Texas A&M, as well as those who will stand "able and ready" to apply for faculty appointments at Texas A&M at some point in the future. ROA.86-101. The parties agreed, however, to stay consideration of the class-certification motion until after the district court's ruling on the defendants' motion to dismiss. ROA.129.

10. The amended complaint names "Texas A&M University," rather than the "Texas A&M University System," as the institutional defendant,

The defendants then moved to dismiss the amended complaint for lack of subject-matter jurisdiction and failure to state a claim. ROA.186-213. On May 30, 2023—one day before the scheduled hearing on the defendants' motion to dismiss—the defendants filed a notice of supplemental authority to inform the district court of Senate Bill 17 (SB 17), which had recently passed the Texas legislature and would outlaw race and sex preferences in employment at public universities. ROA.365-367 (notice); ROA.371-376 (text of SB 17); *see also* Tex. Educ. Code § 51.3525(b)(1)(D) ("The governing board of an institution of higher education shall ensure that each unit of the institution . . . does not, except as required by federal law . . . give preference on the basis of race, sex, color, ethnicity, or national origin to an applicant for employment, an employee, or a participant in any function of the institution.").

After the district court held a hearing on the defendants' motion to dismiss, it announced that it would defer ruling on the defendants' Rule 12(b)(6) motion until the Supreme Court issued its ruling in *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181 (2023). ROA.383. The district court also ordered the parties to confer on whether they wish to submit supplemental briefing on how SB 17 affects the

---

and dropped all claims brought against the Texas A&M University System as well as the claims brought against the chair and members of the Board of Regents of the Texas A&M University System. ROA.180. The amended complaint also includes the president and provost of Texas A&M University as named defendants, who had been omitted as defendants in the original complaint. *Compare* ROA.13 with ROA.161.

justiciability of Professor Lowery's claims. ROA.383-384. The parties filed their supplemental briefs on June 30, 2023,[11] and their reply briefs on July 12, 2023.[12]

Professor Lowery insisted that the mere enactment of SB 17 could not moot his claims because he denied that Texas A&M intends to comply with these new requirements of state law, given that Texas A&M has been flouting the explicit anti-discrimination requirements in Title VI and Title IX for decades. ROA.401. Professor Lowery also argued that he must be allowed an opportunity for discovery before the district court determines whether the defendants have carried their burden of demonstrating mootness. ROA.401. And Professor Lowery noted that the defendants produced no affidavits or evidence showing that they will comply with SB 17. ROA.402.

Professor Lowery also attached evidence showing that Texas A&M University has no intention of implementing the colorblind and sex-neutral hiring practices required by SB 17. He noted that Texas A&M's Office for Diversity was still boasting on its website—even after Governor Abbott signed SB 17 into law—that the university intends to consider race and sex in faculty hiring, by claiming that the university will:

- "In new hires, increase by 100% the diversity of our faculty to better reflect the diversity of our student body."

---

11. ROA.389-413.
12. ROA.487-511; ROA.610-653.

- "Increase by 50% the retention of women faculty on the tenure track to better reflect the diversity of our student body."

ROA.402; ROA.406.

Professor Lowery also noted that when Governor Abbott issued a directive in February of 2023 that prohibited universities from requiring faculty candidates to submit "diversity statements," defendant Annie McGowan announced at a faculty senate meeting on February 14, 2023, that the university would circumvent the governor's directive by asking faculty candidates to address diversity in their "teaching and research statements" instead:

> We're looking for actual evidence, it's an evidence-based approach to the work that the person has done. Therefore, it is not necessary that we have a diversity statement per se to do the work, if we ask for the candidate to reflect on that work in their teaching and research statement.[13]

Professor Lowery also pointed out that when Chancellor John Sharp issued an order in February banning the use of DEI statements in faculty hiring in response to the governor's directive, the university continued to encourage the use of DEI statements in faculty statements but hid its evasion of the governor's directive by deleting incriminating materials from its website and moving them to a password-protected training manual available only to Texas A&M employees. ROA.403; ROA.407.

Professor Lowery submitted evidence of Texas A&M University's attempt to hire Kathleen McElroy to lead its journalism program. McElroy is an ardent proponent of DEI who opposes meritocracy and supports racial

---

13.   ROA.403.

discrimination against whites and Asians to achieve demographic balancing on university faculties. ROA.403; ROA.408-411; ROA.654-686. McElroy was chosen for this job in June of 2023 despite the recent enactment of SB 17, which bans DEI offices at public universities and requires colorblind and sex-neutral hiring practices. Professor Lowery observed that "[t]hese are not the actions of a university that intends to implement colorblind and sex-neutral hiring practices in response to SB 17," and that he "expect[s] that discovery will uncover more damaging evidence to the university's position." ROA.404.

Professor Lowery then moved for leave to file a second amended complaint in response to SB 17 and the Supreme Court's ruling in *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181 (2023), as neither of these events had occurred when Professor Lowery filed his first amended complaint on December 23, 2022. ROA.512-609. The amended pleading proposed by Professor Lowery included facts that allege the continued existence of an Article III case or controversy despite the recent enactment of SB 17 and the ruling in *Students for Fair Admissions*. ROA.528-531. It specifically alleges (among other things) that:

- "[T]he governing board of Texas A&M has not taken steps to ensure that the defendants stop discriminating on account of race or sex in faculty hiring and compensation."[14]

---

14.  ROA.528 (¶ 51).

- "The defendants have been flouting [Title VI and Title IX] for decades, and the enactment of a redundant state anti-discrimination measure and the issuance of a Supreme Court ruling will not induce them to comply."[15]

- "[T]he defendants intend to continue using race and sex preferences in faculty hiring despite the enactment of SB 17 and the announcement of the Supreme Court's ruling in *Students for Fair Admissions*, and they will continue doing so unless and until they are enjoined by the Court."[16]

- "Texas A&M *still* boasts on its website that intends to consider race and sex in faculty hiring."[17]

- "[W]hen Governor Abbott issued a directive in February of 2023 that prohibited universities from requiring 'diversity statements' from faculty candidates, defendant Annie McGowan announced at a faculty senate meeting on February 14, 2023, that the university would circumvent the governor's directive by asking faculty candidates to address diversity in their 'teaching and research statements' instead."[18]

- "When Chancellor Sharp issued an order in February of 2023, banning the use of DEI statements in faculty hiring in response to the governor's directive, the university continued to encourage the use of DEI statements in faculty statements but hid its evasion of the governor's directive by deleting incriminating materials from its website and moving them to a password-protected training manual available only to Texas A&M employees."[19]

---

15. ROA.529 (¶ 51).
16. ROA.529 (¶ 52).
17. ROA.529 (¶ 53).
18. ROA.529 (¶ 54).
19. ROA.530 (¶ 55).

- "In June of 2023, the university hired Kathleen McElroy, an exceedingly pro-DEI individual . . . , to direct its new journalism program."[20]

- "A recent dean-search committee at the Mays Business School was pressured by the university administration to interview underqualified female and minority candidates, despite the fact that these discriminatory preferences were flatly prohibited by Title VI and Title IX."[21]

- "The named defendants have no intention of complying with SB 17 or *Students for Fair Admissions*. They will continue to defy the law—just as they have defied Title VI and Title IX—and they will continue pressuring faculty appointment and search committees to discriminate in favor of unqualified or underqualified female or minority candidates until they are enjoined by a court and subjected to judicial oversight."[22]

Professor Lowery attached a sworn declaration from Professor Adam Kolasinski, which described in detail how the administration at Texas A&M University had recently pressured the dean's search committee at the Mays Business School to interview an unqualified black candidate and an unqualified female candidate, and how Professor Kolasinski faced retaliation from then-interim dean Ricky Griffin when Kolasinski objected to interviewing these unqualified candidates. ROA.572-577. Professor Kolasinski's declaration also says:

---

20.  ROA.530 (¶ 56).

21.  ROA.530 (¶ 57); *see also* ROA.572-577 (declaration of Professor Adam Kolasinski describing the pressure applied to the dean-search committee).

22.  ROA.531 (¶ 58).

> There is no reason to believe that the enactment of Senate Bill
> 17 or the Supreme Court's recent decision in *Students for Fair
> Admissions* will change any of this. Race and sex discrimination
> in faculty hiring have been outlawed for more than 50 years by
> Title VI and Title IX, yet university officials ignore and flout
> these laws in their zeal to impose diversity mandates on every
> aspect of the university. . . .
>
> I am convinced that the university administration will continue
> to pressure faculty appointment and search committees to dis-
> criminate in favor of unqualified or underqualified female or mi-
> nority candidates until they are enjoined by a court from doing
> so.

ROA.572-573 (¶ 5); ROA.576 (¶ 19).

After seeking leave to amend, Professor Lowery submitted five subse-
quent notices to inform the district court of factual developments relevant to
the defendants' mootness argument. The first notice, filed on July 23, 2023,
told the district court of President Banks's resignation in response to the uni-
versity's attempt to hire Kathleen McElroy. ROA.654-695. It also informed
the court that some faculty members at Texas A&M were calling for N.K.
Anand (the vice president for faculty affairs) to resign as well, but that Dun-
can M. Walker, the associate dean for graduate programs in the college of en-
gineering, defended Anand in the following e-mail that he sent to the faculty
senate:

> NK has always placed a high value on developing a faculty that
> is representative of Texas. I have seen him reject a slate of on-
> campus interview candidates because he felt that the search
> committee had not done a good enough job building a repre-
> sentative pool of candidates, and they needed to go back and do

a better job. And he has worked hard to help departments land candidates to help us achieve that representation. . . .

ROA.656; ROA.688. This e-mail is remarkable in many respects. First, it acknowledges that defendant Anand "has always placed a high value on developing a faculty that is representative of Texas," and offers this as a reason for Anand to *keep* his current job. Walker expected the faculty senate to respond favorably to Anand's efforts to achieve proportional racial representation on the Texas A&M faculty, even though SB 17 (as well as federal law) prohibits consideration of race and sex in hiring decisions.

Second, Walker's e-mail admits that Anand has personally rejected *entire slates* of on-campus interview candidates—not because of anything related to merit, but because Anand deemed the candidates insufficiently diverse. This, too, is offered as a reason for Anand to keep his job rather than lose it. There is not even an inkling in Walker's e-mail that Anand's actions were unlawful, or that discriminatory hiring practices of this sort will become unlawful when SB 17 takes effect on January 1, 2024.

Third, Walker's e-mail lauds Anand as an individual who "always follows university policies and procedures," which indicates that university "policies" and "procedures" allow or even encourage Anand (and possibly other university administrators) to reject entire slates of interview candidates based solely on their demographic characteristics. It certainly shows that there is no university policy *against* this behavior; otherwise Walker's praise for Anand's efforts at "developing a faculty that is representative of Texas" would con-

tradict his description of Anand as one who "always follows university policies and procedures."

Professor Lowery filed a second notice on July 27, 2023, to inform the Court of an e-mail that then-Acting President Mark A. Welsh III had sent to the Texas A&M community, which offered a ringing endorsement of the university's diversity-related practices:

> Texas A&M has been in the news lately, and not for the reasons we would like. But recent events and the accompanying commentary do not define us as an institution, nor do they undo the great work we see across this university every day. They should, however, remind us that living up to our core values is an ongoing commitment, as even esteemed institutions like ours must consistently confront and resolve challenges to uphold our status as a great university. Just to be clear on where I stand, I believe diversity in all its forms is a strength.

ROA.696; ROA.700. Welsh's e-mail does not acknowledge SB 17 or *Students for Fair Admissions*, and it does not even indicate an awareness that using race or sex preferences to promote diversity is illegal under state and federal law. ROA.699-700. Instead, it implies that diversity is a "core value" of the university and offers not even the slightest suggestion that the university intends to change its ways in response to SB 17 or *Students for Fair Admissions*. *See id.*

On August 1, 2023, Professor Lowery filed a third notice, which attached a copy of a reappointment letter that Professor Adam Kolasinski had received from the dean of the Mays Business School and the interim head of the finance department. ROA.702-711. The reappointment letter issued to Professor Kolasinski included a requirement that he make "contributions to Texas

A&M diversity and inclusion goals" as a condition of his continued employment. ROA.702; ROA.707. The notice also included a declaration from Professor Kolasinski stating that "[r]eappointment letters issued by my department before the Banks administration took office did not require any contributions toward diversity-and-inclusion 'goals.'" ROA.711 (¶ 7). Professor Kolasinski also stated in his declaration that:

> It is astounding that the university continues to include this language in faculty reappointment letters after the enactment of Senate Bill 17 and the Supreme Court's ruling in *Students for Fair Admissions*. But this behavior is entirely to be expected of a university administration that has no intention of complying with the law or the Court's decision.

ROA.711 (¶ 8).

Professor Lowery filed his fourth notice on August 17, 2023, which informed the court of a statement that then-Interim President Welsh had made during a faculty senate meeting. When asked about the implementation of SB 17 and how it would affect the university, Interim President Welsh said:

> I was actually fairly pleased with the interpretation the General Counsel took of [Senate] Bill 17 . . . . The only specific references to shutting things down were to activities that had D, E, and I in the title, that were labelled as D, E, and I, and did work in that field, those are restricted by the state bill. . . . I actually was, not pleasantly surprised because I'm not pleasantly surprised by anything related to this bill, but it was actually something that led me to believe we can actually comply with the law, and we can still do the things that make sense to do as we prepare men and women to go work in communities that have people of all colors, all language backgrounds, all socioeconomic strata, they got to go live in a big world and we need to prepare

> them to do it. And so I don't think there's anything that's going
> to be in there that's going to stop us from doing the things we
> need to do, including targeted recruiting.

ROA.742-743. The statement indicates that President Welsh (as well as the general counsel's office at Texas A&M) believes that SB 17 requires only the termination of programs or activities with the words "diversity," "equity," or "inclusion" in their title. This suggests that Texas A&M intends to continue allowing discriminatory programs or activities—including faculty-hiring practices that discriminate on account of race or sex—so long as they can do so while avoiding the nomenclature associated with "diversity," "equity," or "inclusion." The president also believes that SB 17 allows Texas A&M to continue doing "the things that make sense to do" and "the things we need to do," and he specifically endorsed the practice of "targeted recruiting." It is not clear what exactly President Welsh meant by "targeted recruiting," or whether he was referring to the recruitment of students or faculty (or both). But these are not the words that one would expect to hear from a university president who intends to enforce colorblind and sex-neutral faculty-hiring practices in response to SB 17.

Professor Lowery filed his fifth and final notice on August 18, 2023, which reported on several statements that then-Interim President Welsh had made during a virtual all-faculty-and-staff meeting. Welsh said:

> We have to redouble our efforts to attract faculty of color. We
> need to redouble our efforts to attract students of color. And
> there's nothing in any state legislation that keeps us from doing

that. We just have to get serious about the job. And so we plan to
do that.

ROA.747 (citing https://youtu.be/DhZR5JD2Aw8?t=243). He also said:

I also believe that diversity is a strength. I believe inclusion of all
people, all ideas, all voices in an imperative for success in large
organizations. And I believe equity is just a way we ought to live
our lives. And so I think we can do all things that we need to be
doing here, and not be scared of repercussions from anywhere
outside Texas A&M University, because they make common
sense, and common sense should be the first standard we apply
here.

ROA.748 (citing https://youtu.be/DhZR5JD2Aw8?t=570). President Welsh
also described himself as the university's "chief diversity officer." ROA.748
(citing https://youtu.be/DhZR5JD2Aw8?t=653).

## IV. The District Court's Ruling

On September 29, 2023, the district court dismissed Professor Lowery's
claims for lack of Article III standing and mootness. ROA.768-781. The dis-
trict court construed the defendants' Rule 12(b)(1) motion as a "factual"
challenge rather than a "facial" challenge to its subject-matter jurisdiction,
because the defendants' motion "attaches evidence not referenced in Low-
ery's complaint." ROA.773; *see also Menchaca v. Chrysler Credit Corp.*, 613
F.2d 507, 511 (5th Cir. 1980) (explaining the distinction between a "facial"
and "factual" attack on a district court's subject-matter jurisdiction).

The district court held that Professor Lowery had failed to allege or es-
tablish Article III injury because he had not yet applied for a faculty position
at Texas A&M. ROA.773-774. It also held that Professor Lowery had failed to

establish that he will encounter discriminatory treatment on account of the ACES Plus program, the reserved faculty hiring lines, or the faculty senate resolution described in his first amended complaint. ROA.774-775 (district-court opinion); ROA.163-168 (¶¶ 15–30) (relevant allegations in the first amended complaint); *see also* ROA.776 ("Lowery fails to show that, as a prospective applicant to Mays Business School, he would be impacted by any of the preferential-treatment programs that Texas A&M faculty and leadership have allegedly deemed important and elsewhere—prior to SB 17—attempted to advance.").

The district court went on to hold, in the alternative, that the enactment of SB 17 moots Professor Lowery's claims that seek relief over the "past practices" at Texas A&M, and renders Professor Lowery's claims for prospective relief unripe. ROA.777 ("[T]he relief that Lowery seeks as to past practices is moot, and the relief that he seeks prospectively isn't ripe."). The district court explained that "Texas A&M is entitled to a presumption of good faith that it will comply with SB 17 and discontinue any conflicting practices,"[23] ROA.778, and that Professor Lowery's challenges to Texas A&M's faculty-hiring practices "will only be appropriate, if ever, after SB 17 actually takes effect." ROA.779.[24]

---

23. ROA.778 (citing *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 325 (5th Cir 2009)).

24. The district court declined to reach or resolve the defendants' sovereign-immunity arguments or Rule 12(b)(6) motion given its decision to dismiss on these jurisdictional grounds. ROA.779-780.

Finally, the district court denied Professor Lowery's motion for leave to file a second amended complaint, holding that the proposed amendments would be "futile" and "do nothing to overcome" the jurisdictional shortcomings described by the district court. ROA.780-781. Professor Lowery filed a timely notice of appeal. ROA.783.

## Summary Of Argument

1.    The district court erred in dismissing Professor Lowery's claims for lack of Article III standing. Professor Lowery has standing to seek injunctive relief against Texas A&M's discriminatory hiring practices so long as he stands "able and ready" to apply for a faculty position, and so long as the use of race and sex preferences will prevent Professor Lowery from competing on an equal basis with female and minority faculty candidates. *See Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993); *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003); *Carney v. Adams*, 592 U.S. 53, 60-66 (2020). Professor Lowery's declaration explains in detail how he stands "able and ready" to apply for a faculty appointment at Texas A&M,[25] and he presented evidence showing how the use of race and sex preferences pervades faculty-hiring decisions not only at the Mays Business School but throughout Texas A&M University. *See infra* at 35–39. The district court held that Professor Lowery lacked Article III standing because he had not yet applied for a faculty appointment at Texas A&M

---

25.   ROA.306-310 (¶¶ 3–21).

and will not do so until Texas A&M gets rid of its discriminatory hiring practices. ROA.773-774. But the district court never denied that Professor Lowery stood "able and ready" to apply for a faculty appointment at Texas A&M, and *that* is the test for determining whether Professor Lowery can sue for prospective relief. Nor did the district court deny or refute the evidence of race and sex preferences that Professor Lowery had submitted.

2.    When a defendant brings a "factual" (as opposed to a "facial") challenge to a court's subject-matter jurisdiction, the plaintiff must be afforded an opportunity for discovery before the district court resolves issues of jurisdictional fact. *See Williamson v. Tucker*, 645 F.2d 404, 414 (5th Cir. 1981). The defendants brought a "factual" rather than "facial" challenge under Rule 12(b)(1) and the district court acknowledged as much, ROA.773, yet the district court resolved disputed issues of fact and denied the truth of Professor Lowery's allegations without providing an opportunity for discovery. So if this Court is unwilling to reverse the district court's jurisdictional dismissal, it should (at the very least) vacate and remand for jurisdictional discovery before affirming the district court's decision.

3.    The district court erred in holding that the enactment of Senate Bill 17 moots Professor Lowery's claims and renders them unripe. The defendants bear the burden of proving mootness,[26] and they failed to produce *any*

---

26.    *See Los Angeles County v. Davis*, 440 U.S. 625, 631 (1979) ("The burden of demonstrating mootness 'is a heavy one.'" (quoting *United States v. W. T. Grant Co.*, 345 U.S. 629, 632-33 (1953)).

affidavits or evidence showing that Texas A&M will comply with SB 17 and institute colorblind and sex-neutral hiring practices. University officials and employees are not entitled to the "presumption of good faith" that *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 325 (5th Cir. 2009), accords to government actors,[27] and even if they were Professor Lowery has rebutted that presumption with the evidence showing that Texas A&M intends to continue using race and sex preferences despite the enactment of SB 17. *See supra* at pp. 14–24.

4. If this Court reverses or vacates the district court's jurisdictional dismissal, then it should also reverse the district court's denial of Professor Lowery's motion for leave to amend his first amended complaint. A court must "freely give leave" to amend a complaint "when justice so requires,"[28] and Professor Lowery should be allowed to add new factual allegations regarding Texas A&M's response to SB 17 and the Supreme Court's ruling in *Students for Fair Admissions*, neither of which existed when Professor Lowery submitted his first amended complaint in December of 2022.

---

27. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 328 (5th Cir. 2020) ("In some cases this court has 'treat[ed] a voluntary governmental cessation of possibly wrongful conduct with some solicitude,' *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 325 (5th Cir. 2009), but this relaxed standard has not been applied to voluntary cessation by a public university.").

28. Fed. R. Civ. P. 15(a)(2).

## STANDARD OF REVIEW

The district court's decision to dismiss Professor Lowery's claims for lack of subject-matter jurisdiction is reviewed de novo. *See McLin v. Twenty-First Judicial District*, 79 F.4th 411, 415 (5th Cir. 2023). Its decision to deny Professor Lowery's motion for leave to amend the pleadings is reviewed for abuse of discretion. *See St. Germain v. Howard*, 556 F.3d 261, 262 (5th Cir. 2009).

## ARGUMENT

### I.    THE DISTRICT COURT ERRED IN DISMISSING PROFESSOR LOWERY'S CLAIMS FOR LACK OF ARTICLE III STANDING

The district court held that Professor Lowery lacks Article III standing because he has not yet applied for a faculty position at Texas A&M and will not do so until the university repudiates its use of race and sex preferences in faculty hiring. ROA.773-774. But the Supreme Court has made clear that a potential applicant does not need to apply or show that he is certain to apply before he can challenge a defendant's racially discriminatory selection practices. It is enough if Professor Lowery stands "able and ready" to apply for a faculty position at Texas A&M—even if he is currently unwilling to apply on account of the defendants' racially discriminatory policies. *See Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993) ("To establish standing, therefore, a party challenging a set-aside program like Jacksonville's need *only* demonstrate that it is *able and ready to bid on contracts* and that a discriminatory policy pre-

vents it from doing so on an equal basis." (emphasis added)); *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003) ("After being denied admission, Hamacher demonstrated that he was 'able and ready' to apply as a transfer student should the University cease to use race in undergraduate admissions. *He therefore has standing* to seek prospective relief" (emphasis added)); *Carney v. Adams*, 592 U.S. 53, 60-66 (2020). If a plaintiff stands "able and ready" to apply and a discriminatory selection practice prevents him from being considered on an equal basis with others, then he has standing to seek prospective relief.

Professor Lowery specifically alleged that he is "able and ready" to apply to Texas A&M,[29] and that the university's "pervasive and ongoing use of race and sex preferences" prevents him from competing with other applicants on an equal basis.[30] And Professor Lowery supported those allegations with a sworn declaration explaining his interest in seeking an appointment at Texas A&M,[31] as well as evidence of the race and sex preferences at Texas A&M that prevent white and Asian men from competing on an equal playing

---

29. ROA.169 (¶ 34) ("Professor Lowery stands 'able and ready' to apply for a faculty appointment at Texas A&M University").

30. ROA.171 (¶ 45) ("The pervasive and ongoing use of race and sex preferences and set-asides at Texas A&M University prevents Professor Lowery from competing with other applicants for these faculty positions on an equal basis.").

31. ROA.306-310 (¶¶ 3–21); *see also supra* at pp. 9–12.

field with faculty candidates from other demographics.[32] That is more than enough to defeat both a "facial" and a "factual" challenge to Professor Lowery's Article III standing. *See Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980) (explaining the differences between "facial" and "factual" challenges to a court's subject-matter jurisdiction).

It does not matter that Professor Lowery has not formally applied for a faculty appointment at Texas A&M, or that he will not apply until Texas A&M eliminates the use of race and sex preferences in faculty hiring.[33] Professor Lowery needs only to show that he stands "able and ready" to apply for a faculty position at Texas A&M, and the district court did not deny that Professor Lowery had made this showing. ROA.773-774. The district court

---

32. ROA.177-178 (ACES Plus memo); ROA.179 (e-mail exchange demonstrating that the Mays Business School reserved a faculty hiring line for an "underrepresented minority"); ROA.165–167 (¶¶ 23–28) (evidence of the Texas A&M faculty senate overwhelmingly adopting a resolution that endorses "diversity, equity, and inclusion efforts," including "ACES Plus, [which] aim[s] to diversify the ranks of faculty"); ROA.167 (¶ 26) (statement of Professor Angie Hill Price referring to other "DEI initiatives" and other "coordinating board initiatives," in addition to the ACES Plus program, designed to make the demographic makeup of the Texas A&M faculty less white and less Asian); ROA.401-411; ROA.528-531 (¶¶ 48–58); ROA.572-605; ROA.654-686; ROA.696-711; ROA.742-752.

33. ROA.308 (¶ 12) ("Although I stand "able and ready" to apply for a faculty appointment at Texas A&M University, I will not do so until I can compete on an even playing field with female faculty candidates and faculty candidates of other races. I would have already applied for a faculty position at Texas A&M University were the university not using these discriminatory hiring practices.").

nonetheless denied standing out of concern that allowing Professor Lowery to sue would open the door for "any putative plaintiff [to] sue a potential employer without ever applying, simply upon allegation the posited discriminatory practices deterred application." ROA.773. That is untrue. A plaintiff must allege (and eventually prove) that he stands "able and ready to apply" for that job; it is not enough to simply allege that an employer's discriminatory practices deterred him from applying. *See Carney*, 592 U.S. at 60. Mr. Lowery's declaration explains in detail how he stands "able and ready" to apply for a faculty position at Texas A&M. ROA.306-310 (¶¶ 3–21). And Mr. Lowery has produced far more in this regard than the plaintiff in *Carney*, who produced nothing more than a "few words of general intent" to apply for a judgeship. *See Carney*, 592 U.S. at 64. Mr. Lowery's declaration explains his dissatisfaction with his current job, the many reasons why he wants to apply for a faculty appointment at Texas A&M, and his reasons for not submitting a formal application to Texas A&M at this time. ROA.306-308 (¶¶ 4–15).

If a plaintiff shows that he is "able and ready" to apply, as Professor Lowery has done, then he does not need to submit an application to establish Article III standing. *See Associated General Contractors*, 508 U.S. at 666; *Gratz*, 539 U.S. at 262; *Carney*, 592 U.S. at 60-66. Professor Lowery is seeking only prospective relief, so he does not need to show past injury arising from Texas A&M's treatment of a previously submitted application. Indeed, any past injury of that sort would be irrelevant to a litigant's standing to seek prospective relief. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102-03 (1983)

(past injury is not relevant to a plaintiff's standing to seek prospective relief against future harms). Finally, the fact that Texas A&M's discriminatory hiring practices deterred Professor Lowery from applying is itself an Article III injury in fact, so long as Professor Lowery stood "able and ready" to apply for a faculty position. *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 365-66 (1977) ("If an employer should announce his policy of discrimination by a sign reading 'Whites Only' on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs. . . . When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application.").

The district court tried to escape the holdings of *Associated General Contractors* and *Gratz* by observing that the plaintiffs in those cases had "applied to the challenged program at some point in the past and intended to do so again." ROA.774. But the plaintiff in *Associated General Contractors* alleged only that its members had bid on "construction contracts" in Jacksonville—and it specifically asserted that they had *not* bid on the disputed contracts that the city had "set aside" for minority-owned businesses. *See Associated General Contractors*, 508 U.S. at 668 ("[P]etitioner alleged that its members regularly bid on construction contracts in Jacksonville, and that they *would have bid on contracts set aside* pursuant to the city's ordinance were they so able." (emphasis added)). Like Professor Lowery, the plaintiff in *Associated*

*General Contractors* claimed only that its members *would* bid on the contracts covered by the city's 10% set-aside once the discriminatory policy was enjoined. *See id.*; ROA.308 (¶ 12) ("Although I stand "able and ready" to apply for a faculty appointment at Texas A&M University, I will not do so until I can compete on an even playing field with female faculty candidates and faculty candidates of other races. I would have already applied for a faculty position at Texas A&M University were the university not using these discriminatory hiring practices."). That was all that was needed to confer standing to seek prospective relief in *Associated General Contractors*, as it showed that the plaintiff's members stood "able and ready" to bid on the disputed contracts. *See Associated General Contractors*, 508 U.S. at 666 ("To establish standing, therefore, a party challenging a set-aside program like Jacksonville's need *only* demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis." (emphasis added)).

The plaintiffs in *Gratz* were suing for *damages* as well as prospective relief,[34] so they needed to allege (and prove) a past injury arising from the defendants' discriminatory treatment of their previously submitted applications. *See Gratz*, 539 U.S. at 284 (Stevens, J., dissenting) ("Both Hamacher

---

34. *See Gratz*, 539 U.S. at 262 ("Petitioners sought . . . damages for past violations, declaratory relief finding that respondents violated petitioners' 'rights to nondiscriminatory treatment,' an injunction prohibiting respondents from 'continuing to discriminate on the basis of race in violation of the Fourteenth Amendment'").

and Gratz, of course, have standing to seek damages as compensation for the alleged wrongful denial of their respective applications under Michigan's old freshman admissions system."). But the Court made clear that the plaintiffs' past applications had no bearing on their standing to seek *prospective* relief:

> [W]hether Hamacher "actually applied" for admission as a transfer student is not determinative of his ability to seek injunctive relief in this case. If Hamacher had submitted a transfer application and been rejected, he would still need to allege an intent to apply again in order to seek prospective relief.

*Gratz*, 539 U.S. at 260-61 (emphasis added); *see also Lyons*, 461 U.S. at 102-03. The Court also held that the plaintiffs' standing to seek prospective relief turned *solely* on whether they were "able and ready" to re-apply to the university:

> Hamacher demonstrated that he was "able and ready" to apply as a transfer student should the University cease to use race in undergraduate admissions. ***He therefore has standing to seek prospective relief*** with respect to the University's continued use of race in undergraduate admissions.

*Gratz*, 539 U.S. at 262 (emphasis added). Professor Lowery is seeking only prospective relief and not damages,[35] so he needs only to show that he stands "able and ready" to apply for a faculty appointment at Texas A&M.

The district court also held that Professor Lowery failed to allege or establish that *he* would suffer discriminatory treatment if he applied for a faculty appointment at Texas A&M. That is untrue. Professor Lowery provided not only allegations but evidence that Texas A&M's business school and its

---

35.  ROA.174-175.

finance department are using race and sex preferences in faculty hiring—and this is the very department at Texas A&M from which Mr. Lowery wishes to obtain an appointment. The evidence shows that:

- The department of finance at the Mays Business School established a faculty-hiring line that it reserved for an "underrepresented" minority;[36]

- A recent dean-search committee at the Mays Business School was pressured by the university administration to interview underqualified female and minority candidates;[37] and

- A reappointment letter issued to Professor Adam Kolasinski by the dean of the Mays Business School and the interim head of the finance department required that he make "contributions to Texas A&M diversity and inclusion goals" as a condition of his continued employment.[38]

The district court dismissed Professor Lowery's reliance on the faculty-hiring line that the department of finance reserved for "underrepresented minorities" because Professor Johnson's e-mail said it would "*potentially* be a third position." ROA.775 (quoting ROA.179 (emphasis added)). The district court explained:

> This speaks of future possibilities, not of future certainties. And so, plainly missing is any allegation that such a hiring line is (or was) *currently* in place. As such, it doesn't speak of current practices or establish present injuries.

---

36.  ROA.165 (¶¶ 20–21); ROA.179.
37.  ROA.572-577.
38.  ROA.707.

ROA.775. But the district court is quoting Professor Johnson out of context. Professor Johnson wrote:

> The underrepresented line would potentially be a third position, so yes reserved, but not one of our "regular" positions.

ROA.179. This describes an actual faculty-hiring line currently in existence that is "reserved" for underrepresented minorities. A faculty-hiring line cannot be "reserved" unless it actually exists. Professor Johnson describes it as "potentially . . . a third position" because there is no guarantee that the department of finance will find a suitable minority candidate to fill that "reserved" spot. There is no uncertainty that this "reserved" faculty-hiring line exists—and that white and Asian individuals such as Professor Lowery will not be considered for it. But even if this "reserved" faculty-hiring line only "potentially" existed, it is nonetheless clear that the Mays Business School and its finance department are consciously and intentionally discriminating in favor of underrepresented-minority faculty candidates. That inflicts Article III injury on whites and Asians who stand "able and ready" to apply for faculty positions in the finance department.

More importantly, Professor Lowery is claiming that race and sex preferences infect *all* components of faculty hiring at Texas A&M University, and he produced the following evidence to support this claim:

- The website of Texas A&M's Office for Diversity boasted that the university intended to "[i]n new hires, increase by 100% the diversity of our faculty to better reflect the diversity of our student body," and "[i]ncrease by 50% the retention of

women faculty on the tenure track to better reflect the diversity of our student body";[39]

- N.K. Anand, Texas A&M's vice president for faculty affairs, was described in an e-mail as having personally rejected entire slates of on-campus interview candidates as insufficiently diverse, and as "always plac[ing] a high value on developing a faculty that is representative of Texas";[40]

- Texas A&M President Mark A. Welsh III, shortly after taking office, made repeated comments supporting the university's DEI policies and practices;[41]

- Annie McGowan, Texas A&M's vice president and associate provost for diversity, announced that the university would circumvent Governor Abbott's order banning state universities from requiring faculty candidates to submit "diversity statements," by asking faculty candidates to address diversity in their "teaching and research statements" instead;[42]

- Texas A&M attempted to hire Kathleen McElroy, an ardent proponent of DEI who advocates racial discrimination against whites and Asians, to lead its journalism program shortly after the passage of SB 17;[43]

- The ACES Plus memo of July 8, 2022, announced a goal of "moving the structural composition of our faculty towards parity with that of the State of Texas";[44]

---

39. ROA.402; ROA.406.

40. ROA.688.

41. ROA.700; ROA.742-743; ROA.747-748.

42. ROA.403.

43. ROA.403; ROA.408-411; ROA.654-686.

44. ROA.177.

- The faculty senate overwhelmingly adopted a resolution on October 17, 2022, that supported the goal of "diversify[ing] the ranks of faculty to better represent our state and our student body," over the objections of Professor Adam Kolasinski;[45] and

- Professor Angie Hill Price referred at a faculty senate meeting to other "DEI initiatives" and other "coordinating board initiatives," in addition to ACES Plus, designed to make Texas A&M's faculty less white and less Asian.[46]

The district court did not deny any of this, and the defendants did not contest or refute any of this evidence. So Professor Lowery has done more than enough to survive a motion to dismiss on the issue of Article III standing. It is clear that Texas A&M University discriminates against white and Asian men in its faculty hiring, and Professor Lowery's job application will be viewed less favorably than an application submitted by an identically situated female or non-Asian racial minority.

## II.  The District Court Should Have Allowed Professor Lowery To Take Discovery Before Considering The Factual Evidence In The Defendants' Rule 12(b)(1) Motion

The district court correctly construed the defendants' Rule 12(b)(1) motion as a "factual" attack on the district court's subject-matter jurisdiction, as Texas A&M relied on evidence outside the pleadings and denied the truth of Professor Lowery's factual allegations. ROA.773 ("Texas A&M . . . attaches evidence not referenced in Lowery's complaint, thus bringing a factu-

---

45.  ROA.165-166 (¶ 23) (citing https://youtu.be/NJ2UdG2C2_g?t=6175).
46.  ROA.167 (¶ 26) (citing https://youtu.be/NJ2UdG2C2_g?t=6933).

al challenge with its motion to dismiss. Such evidence will be considered where necessary on this inquiry into standing." (citations omitted)); *Mencha-ca*, 613 F.2d at 511 (describing distinction between "facial" and "factual" jurisdictional attacks).

But a court cannot resolve a factual challenge to its subject-matter jurisdiction without first affording the plaintiff an opportunity for discovery into the facts relevant to jurisdiction:

> It is true that the factual determinations decisive of a motion to dismiss for lack of jurisdiction are within the court's power, and that no right to a jury trial exists with regard to such issues. But still the district court must give the plaintiff an opportunity for discovery and for a hearing that is appropriate to the nature of the motion to dismiss.

*Williamson v. Tucker*, 645 F.2d 404, 414 (5th Cir. 1981). The Court did not allow Professor Lowery an opportunity for discovery before granting the defendants' factual Rule 12(b)(1) motion, even though Professor Lowery asked for it. ROA.401; ROA.404. And the district court resolved issues of fact based on declarations and evidence submitted by Texas A&M that Professor Lowery had no opportunity to challenge or counteract through the tools of discovery. ROA.774 (accepting Texas A&M's factual claim that "the Mays Business School participates in neither ACES Plus nor the original ACES Program."). The Court should (at the very least) vacate and remand for jurisdictional discovery before it affirms the district court's decision.

### III. The District Court Erred In Dismissing Professor Lowery's Claims As Moot And Unripe

The district court held that the enactment of SB 17 moots Professor Lowery's claims that seek relief over the "past practices" at Texas A&M, while simultaneously rendering his claims for prospective relief unripe. ROA.777 ("[T]he relief that Lowery seeks as to past practices is moot, and the relief that he seeks prospectively isn't ripe."). This holding is odd because Professor Lowery is seeking only prospective relief and is not requesting damages or retrospective relief of any sort. ROA.174-175. In all events, Professor Lowery's claims for prospective relief are neither moot nor unripe.

#### A. Neither SB 17 Nor *Students For Fair Admissions* Moots Professor Lowery's Claims For Prospective Relief

The defendants bear the burden of proving mootness, and the burden is a "heavy" one. *See Los Angeles County v. Davis*, 440 U.S. 625, 631 (1979) ("The burden of demonstrating mootness 'is a heavy one.'" (quoting *United States v. W. T. Grant Co.*, 345 U.S. 629, 632-33 (1953)). It is not enough for the defendants (or the district court) to point to the enactment of SB 17 and claim that the mere existence of that law eliminates the discriminatory-treatment injuries that Professor Lowery asserts, because Professor Lowery denies that the defendants intend to comply with SB 17 and submitted evidence in support of that claim. *See supra* at pp. 14–24. In addition, the defendants have been flouting for decades the explicit non-discrimination pro-

visions in Title VI and Title IX,[47] which already outlaw race and sex discrimination at universities that receive federal funds, so there is no reason to believe (or assume) that a redundant state-law prohibition on race and sex discrimination will change the defendants' behavior. The defendants have also produced nothing in the way of affidavits or evidence showing that they will comply with SB 17's anti-discrimination provisions, nor have they explained why they intend to comply with the provisions of SB 17 that do nothing more than repeat the anti-discrimination requirements of federal law that the defendants have been violating for decades.

At the very least, Professor Lowery is entitled to take discovery on whether and to what extent the defendants intend to comply with SB 17's prohibitions on race and sex discrimination in faculty hiring,[48] and Texas A&M must *prove* its intent to comply rather than wave SB 17 like a flag. A dismissal for mootness is premature absent an opportunity for discovery and the required proof from the defendants.

### B.    Professor Lowery's Claims Remain Ripe

To determine whether a claim is ripe, a court must consider "the fitness of the issues for judicial decision" and "hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967). Each of these factors cuts decisively in favor of ripeness.

---

47.  *See* 42 U.S.C. § 2000d (Title VI); 20 U.S.C. § 1681 (Title IX).
48.  *See supra* Part II, at pp. 39–40.

The issues are fit for judicial decision because they present pure questions of law: Whether a public university's use of race and sex preferences in faculty hiring comports with Title VI, Title IX, 42 U.S.C. § 1981, and the Equal Protection Clause. *See New Orleans Public Service, Inc. v. Council of City of New Orleans*, 833 F.2d 583, 587 (5th Cir. 1987) ("A case is generally ripe if any remaining questions are purely legal ones"); *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 287 (5th Cir. 2012) ("Opulent Life's facial challenges are easily ripe. First, they are fit for judicial decision because they raise pure questions of law."); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167-68 (2014) ("purely legal" questions satisfy the fitness-for-judicial-decision prong of the ripeness inquiry). These issues are no less fit for judicial resolution after SB 17 as they were before.

Withholding judicial consideration will also impose hardship on Mr. Lowery, who wishes to apply for a faculty appointment at Texas A&M but will not do so until the university eliminates its use of race and sex preferences. ROA.308 (¶¶ 12–13). The defendants have produced no affidavits or evidence showing that they intend to comply with SB 17—or that they will treat SB 17 any differently from the anti-discrimination provisions in Title VI and Title IX that they have willfully disregarded for decades. And Professor Lowery has no assurance that his candidacy for a faculty appointment will be assessed in a colorblind and sex-neutral manner.

The district court held that Professor Lowery's alleged injuries are "contingent [on] future events that may not occur,"[49] and that university officials are "entitled to a presumption of good faith that [they] will comply with SB 17 and discontinue any conflicting practices." ROA.778 (citing *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 325 (5th Cir. 2009)). But neither of these observations makes Professor Lowery's claims unripe. Professor Lowery produced evidence showing that Texas A&M University is currently discriminating against white and Asian men, even after the enactment of SB 17, and that faculty candidates in his demographic are placed at a competitive disadvantage relative to similarly situated female or non-Asian minority applicants.[50] He also produced evidence showing that the defendants have no intention of complying with SB 17 and will continue their discriminatory hiring practices regardless of what state law provides.[51]

More importantly, university officials and employees are not entitled to the "presumption of good faith" that *Sossamon* accords to "government actors in their sovereign capacity and in the exercise of their official duties." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 325 (5th Cir. 2009). *Compare id.* ("[G]overnment actors in their sovereign capacity and in the exercise of their official duties are accorded a presumption of good faith because they

---

49. ROA.778 (quoting *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 580-81 (1985)).

50. *See supra* at pp. 35–39.

51. *See supra* at pp. 14–24.

are public servants, not self-interested private parties."), *with Speech First, Inc. v. Fenves*, 979 F.3d 319, 328 (5th Cir. 2020) ("In some cases this court has 'treat[ed] a voluntary governmental cessation of possibly wrongful conduct with some solicitude,' *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 325 (5th Cir. 2009), but this relaxed standard has not been applied to voluntary cessation by a public university."). Professor Lowery has also accused the defendants of violating federal law, which strips them of any "sovereign capacity" that might otherwise attach. *See Ex parte Young*, 209 U.S. 123, 159-60 (1908). Finally, even if Texas A&M's officials could somehow claim the "presumption of good faith" that *Sossamon* reserves for sovereign governmental actors, Professor Lowery has rebutted that presumption with the evidence showing that Texas A&M intends to continue using race and sex preferences despite the enactment of SB 17.[52] And Professor Lowery is at least entitled to take discovery on these matters before the district court pronounces his claims unripe or presumes that Texas A&M will finally comply with the law. *See supra* Part II, at pp. 39–40.

## IV. The District Court Abused Its Discretion In Denying Professor Lowery's Motion For Leave To Amend His Complaint

After Professor Lowery filed his first amended complaint in December of 2022, the Texas legislature enacted SB 17 and the Supreme Court announced its ruling in *Students for Fair Admissions, Inc. v. President and Fellows of Har-*

---

52.  *See supra* at pp. 14–24.

*vard College*, 600 U.S. 181 (2023). Professor Lowery sought leave to amend his pleadings to allege facts showing that the defendants intend to continue using race and sex preferences in faculty hiring despite the new state law and Supreme Court ruling—allegations that must be assumed true at the motion-to-dismiss stage. ROA.512-609; *Manhattan Community Access Corp. v. Halleck*, 139 S. Ct. 1921, 1927 (2019) ("Because this case comes to us on a motion to dismiss, we accept the allegations in the complaint as true."). The district court denied the motion for leave to amend as "futile,"[53] but this Court should instruct the district court to allow this amendment on remand if it reverses or vacates the jurisdictional dismissal as premature. *See* Fed. R. Civ. P. 15(a)(2) (a court must "freely give leave" to amend a complaint "when justice so requires.").

---

53. ROA.780-781.

## CONCLUSION

The judgment of the district court should be vacated, and the case remanded for further proceedings.

Respectfully submitted.

/s/ Jonathan F. Mitchell

GENE P. HAMILTON
Vice-President and General Counsel
America First Legal Foundation
611 Pennsylvania Avenue SE, #231
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

JONATHAN F. MITCHELL
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

Dated: March 11, 2024

*Counsel for Plaintiff-Appellant*

## Certificate Of Service

I certify that on March 11, 2024, this document was electronically filed with the clerk of the court for the U.S. Court of Appeals for the Fifth Circuit and served through CM/ECF upon:

M. Carter Crow
Layne E. Kruse
Paul Trahan
Ryan Meltzer
Jesika Silva Blanco
Norton Rose Fulbright LLP
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
(713) 651-5151 (phone)
(713) 651-5246 (fax)
carter.crow@nortonrosefulbright.com
layne.kruse@nortonrosefulbright.com
paul.trahan@nortonrosefulbright.com
ryan.meltzer@nortonrosefulbright.com
jesika.blanco@nortonrosefulbright.com

*Counsel for Defendants-Appellees*

 /s/ Jonathan F. Mitchell
Jonathan F. Mitchell
*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

with type-volume limitation, typeface requirements,
and type-style requirements

1.   This brief complies with the type-volume limitation of Fed. R. App. P.
     27(d)(2) because it contains 11,637 words, excluding the parts of the brief ex-
     empted by Fed. R. App. P. 32(f).

2.   This brief complies with the typeface and type-style requirements of Fed. R.
     App. P. 27(d)(1)(E), 32(a)(5), and Fed. R. App. P. 32(a)(6) because it uses
     Equity Text B 14-point type face throughout, and Equity Text B is a propor-
     tionally spaced typeface that includes serifs.

 /s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
Dated: March 11, 2024                                *Counsel for Plaintiff-Appellant*

49

### Certificate Of Electronic Compliance

Counsel also certifies that on March 11, 2024, this brief was transmitted to Mr. Lyle W. Cayce, Clerk of the United States Court of Appeals for the Fifth Circuit, through http://www.pacer.gov.

Counsel further certifies that: (1) required privacy redactions have been made, 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document, 5th Cir. R. 25.2.1; and (3) the document has been scanned with the most recent version of VirusTotal and is free of viruses.

 /s/ Jonathan F. Mitchell 
Jonathan F. Mitchell
*Counsel for Plaintiff-Appellant*