No. 23-20481

In The
# United States Court of Appeals for the Fifth Circuit

RICHARD LOWERY,

Plaintiff-Appellant

v.

TEXAS A&M UNIVERSITY; ANNIE S. MCGOWAN; N. K. ANAND; MARK A. WELSH, III, INTERIM PRESIDENT OF TEXAS A&M UNIVERSITY; ALAN SAMS,

Defendants-Appellees

On Appeal from the United States District Court for the
Southern District of Texas, Case No. 4:22-cv-3091
Hon. Charles Eskridge

## BRIEF FOR DEFENDANTS-APPELLEES

JONATHAN S. FRANKLIN
NORTON ROSE FULBRIGHT US LLP
799 9th Street N.W., Suite 1000
Washington, DC 20001
(202) 662-0466

LAYNE E. KRUSE
M. CARTER CROW
NORTON ROSE FULBRIGHT US LLP
1301 McKinney, Suite 5100
Houston, TX 77010
(713) 651-5194

PAUL D. TRAHAN
RYAN E. MELTZER
NORTON ROSE FULBRIGHT US LLP
98 San Jacinto Blvd., Suite 1100
Austin, TX 78701-4255
(512) 536-5234

May 10, 2024                                    *Counsel for Defendants-Appellees*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Plaintiff | Plaintiff's Counsel |
|---|---|
| Richard Lowery | Jonathan F. Mitchell<br>MITCHELL LAW PLLC<br><br>Gene P. Hamilton<br>AMERICA FIRST LEGAL FOUNDATION |

| Defendants | Defendants' Counsel |
|---|---|
| Texas A&M University<br>Mark A. Welsh III<br>Annie S. McGowan<br>N.K. Anand<br>Alan Sams | Jonathan S. Franklin<br>M. Carter Crow<br>Layne E. Kruse<br>Paul D. Trahan<br>Ryan E. Meltzer<br>NORTON ROSE FULBRIGHT US LLP |

| Former Defendant |
|---|
| M. Katherine Banks |

*/s/ Layne E. Kruse*
Layne E. Kruse

May 10, 2024                  *Counsel for Defendants-Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34 and Fifth Circuit Rule 28.2.3, Defendants-Appellees respectfully request oral argument.  While the district court's resolution was both straightforward and correct, appellees believe that oral argument will assist this Court in understanding the errors in appellant's analysis of both the law and the facts.

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS ........................................ i

STATEMENT REGARDING ORAL ARGUMENT ............................ ii

TABLE OF AUTHORITIES .................................................................v

INTRODUCTION ................................................................................1

STATEMENT OF THE ISSUES...........................................................4

STATEMENT OF THE CASE................................................................5

      A.    Factual Background. ...........................................................5

      B.    The District Court Proceedings...................................8

      C.    The District Court's Jurisdictional Dismissal. .........................21

SUMMARY OF ARGUMENT .............................................................23

STANDARDS OF REVIEW ...............................................................27

ARGUMENT .......................................................................................28

I.    THE DISTRICT COURT DID NOT ERR IN DISMISSING LOWERY'S CLAIMS FOR LACK OF STANDING......................28

      A.    The District Court Did Not Clearly Err in Finding that Lowery Failed to Prove that the Statements and Practices Alleged in His Complaint Posed an Imminent Threat of a Concrete and Particularized Injury to Him. .............................29

      B.    Lowery's Mere Statement of an Intent to Apply Is Insufficient to Establish His Standing to Seek Injunctive Relief. ....................................................................34

II.    THE DISTRICT COURT DID NOT ERR IN ALTERNATIVELY DISMISSING LOWERY'S CLAIMS AS MOOT AND UNRIPE. ..................................................................39

      A.    Lowery's Claims Based on Past Practices Have Been Mooted. ...................................................................39

      B.    Lowery's Claims for Prospective Relief Are Unripe. .............44

III.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY DECIDING THE RULE 12(B)(1) MOTION ON THE EXISTING RECORD.......................................48

IV.    THE DISTRICT COURT DID NOT ERR BY DENYING LEAVE TO FILE AN AMENDED OR SUPPLEMENTAL COMPLAINT .................................................................51

CONCLUSION ...............................................................................55

CERTIFICATE OF SERVICE ......................................................56

CERTIFICATE OF COMPLIANCE ..............................................57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Wright*,
    468 U.S. 737 (1984)..................................................................37

*Already, LLC v. Nike, Inc.*,
    568 U.S. 85 (2013)....................................................................2

*Amawi v. Paxton*,
    956 F.3d 816 (5th Cir. 2020) ........................................40, 41

*Arizonans for Official English v. Arizona*,
    520 U.S. 43 (1997)...................................................................16

*Attala Cnty., Miss. Branch of NAACP v. Evans*,
    37 F.4th 1038 (5th Cir. 2022) ......................................29, 33

*Boudreaux v. La. State Bar Ass'n*,
    86 F.4th 620 (5th Cir. 2023) ...............................43, 45, 47

*Burns v. Exxon Corp.*,
    158 F.3d 336 (5th Cir. 1998) ...............................................28

*Campaign Legal Ctr. v. Scott*,
    49 F.4th 931 (5th Cir. 2022) .......................................28, 33

*Carney v. Adams*,
    592 U.S. 53 (2020).............................................1, 24, 35

*Choice Inc. of Tex. v. Greenstein*,
    691 F.3d 710 (5th Cir. 2012) ..............................................46

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013)...........................................................1, 46

*Daves v. Dallas Cnty., Tex.*,
    64 F.4th 616 (5th Cir. 2023) (en banc) ......................41, 42

*Davis v. Tarrant Cnty., Tex.*,
    565 F.3d 214 (5th Cir. 2009) ..............................................38

*Dean v. Ford Motor Credit Co.*,
    885 F.2d 300 (5th Cir. 1989) ..............................................51

*Duarte ex rel. Duarte v. City of Lewisville, Tex.*,
    759 F.3d 514 (5th Cir. 2014) ..............................................16

*Earl v. Boeing Co.*,
    53 F.4th 897 (5th Cir. 2022) .......................................28, 29

v

*Ellison v. Am. Bd. of Orthopaedic Surgery*,
   11 F.4th 200 (3d Cir. 2021) ............................................................38

*Ellison v. Connor*,
   153 F.3d 247 (5th Cir. 1998) ..........................................................38

*Envtl. Conservation Org. v. City of Dallas*,
   529 F.3d 519 (5th Cir. 2008) ..........................................................41

*FBI v. Fikre*,
   144 S. Ct. 771 (2024)................................................................39, 40

*Flynn v. FCA US LLC*,
   39 F.4th 946 (7th Cir. 2022) ...........................................................54

*Freedom from Religion Found. v. Abbott*,
   58 F.4th 824 (5th Cir. 2023) ...........................................................41

*Freeman v. United States*,
   556 F.3d 326 (5th Cir. 2009) .....................................................28, 50

*Gratz v. Bollinger*,
   539 U.S. 244 (2003)................................................................35, 36

*Hoggatt v. Allstate Ins.*,
   849 F. App'x 74 (5th Cir. 2021) (per curiam) ...................................52

*Int'l Bhd. of Teamsters v. United States*,
   431 U.S. 324 (1977)........................................................................38

*Williams ex rel. J.E. v. Reeves*,
   954 F.3d 729 (5th Cir. 2020) ..........................................................44

*James v. Hegar*,
   86 F.4th 1076 (5th Cir. 2023) .............................29, 33, 34, 35, 44

*Kling v. Hebert*,
   60 F.4th 281 (5th Cir. 2023) ...........................................................27

*Lewis v. Knutson*,
   699 F.2d 230 (5th Cir. 1983) ..........................................................53

*Lopez v. City of Houston*,
   617 F.3d 336 (5th Cir. 2010) ..........................................................44

*Miss. State Democratic Party v. Barbour*,
   529 F.3d 538 (5th Cir. 2008) ..........................................................45

*Moore v. USDA*,
   993 F.2d 1222 (5th Cir. 1993) ........................................................38

*NAACP v. Tindell,*
    95 F.4th 212 (5th Cir. 2024) ..................................................................33

*New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans
    Archdiocesan Cemeteries,*
    56 F.4th 1026 (5th Cir. 2023) .................................................28, 52, 53

*Ne. Fla. Chapter of Assoc'd Gen. Contractors of Am. v. City of
    Jacksonville,*
    508 U.S. 656 (1993) .........................................................................35, 36

*Robertson v. Intratek Comput., Inc.,*
    976 F.3d 575 (5th Cir. 2020) .................................................51, 52, 54

*In re S. Recycling, LLC,*
    982 F.3d 374 (5th Cir. 2020) ..................................27, 28, 48, 50, 51

*Speech First, Inc. v. Fenves,*
    979 F.3d 319 (5th Cir. 2020) ..................................................................43

*Speech First, Inc. v. Killeen,*
    968 F.3d 628 (7th Cir. 2020) ..................................................................43

*Speech First, Inc. v. Schlissel,*
    939 F.3d 756 (6th Cir. 2019) ..................................................................43

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) .................................................................................29

*Staley v. Harris Cnty., Tex.,*
    485 F.3d 305 (5th Cir. 2007) (en banc) ...........................................16

*Stringer v. Whitley,*
    942 F.3d 715 (5th Cir. 2019) .....................................................29, 33, 34

*Tex. Alliance for Retired Ams. v. Scott,*
    28 F.4th 669 (5th Cir. 2022) ..................................................................44

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021)..................................................................................29

*Trump v. New York,*
    592 U.S. 125 (2020).............................................................................2, 45

*U.S. Navy SEALs 1-26 v. Biden,*
    72 F.4th 666 (5th Cir. 2023) ..................................................................41

*United States v. Texas,*
    599 U.S. 670 (2023)..................................................................................28

*United Techs. Corp. v. Mazer,*
    556 F.3d 1260 (11th Cir. 2009) ....................................................49, 51

*Veasey v. Abbott*,
  796 F.3d 487 (5th Cir. 2015) ...................................................................45

*Williamson v. Tucker*,
  645 F.2d 404 (5th Cir. 1981) ............................................................26, 48, 49

*Ex parte Young*,
  209 U.S. 123 (1908)..........................................................................43, 44

**Rules and Statutes**

Fed. R. Civ. P. 15 .................................................................................51

Tex. Educ. Code § 51.3525................................................................3, 14, 40

Tex. Educ. Code § 85.11.........................................................................5

Tex. Educ. Code § 85.21.........................................................................5

Tex. Educ. Code § 86.02.........................................................................5

Tex. Educ. Code § 86.11.........................................................................5

**Other Authorities**

6 Charles A. Wright & Arthur R. Miller, *Federal Practice &*
  *Procedure* § 1504 (1971)......................................................................51

*DEI Compliance Page*, Tex. A&M Univ. Sys.
  (https://tinyurl.com/yc2h256z) .............................................................47

Tex A&M Univ. Sys. Policy No. 08-01 (2023)
  (https://policies.tamus.edu/08-01.pdf) ...............................................16, 41

# INTRODUCTION

This case is, and has always been, purely hypothetical, abstract, and premature.  In 2022, plaintiff-appellant Richard Lowery ("Lowery"), a tenured professor at the University of Texas-Austin ("UT"), asserted that defendant-appellee Texas A&M University ("A&M") unlawfully considered race and sex in faculty hiring decisions and sought to have a federal court supervise A&M's employment process through an intrusive, systemic injunction.  Yet as the district court correctly held, Lowery never came close to carrying his burden to demonstrate Article III standing to seek that injunction by proving that he personally faces a "certainly impending" threat, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013), of "an injury that is concrete, particularized, and imminent rather than 'conjectural or hypothetical,'" *Carney v. Adams*, 592 U.S. 53, 60 (2020).

To the contrary, far from having been denied employment by A&M—much less unlawfully—Lowery has never even applied for a position there and has a pending lawsuit seeking to remain at UT.  And as the district court correctly found, Lowery made no showing that any of the allegedly discriminatory statements and practices identified in his complaint would ever affect him personally, let alone in a "concrete" and "particularized" manner that is "certainly impending" and "imminent."  Indeed, Lowery concededly has never identified ***anyone*** who was ever denied an A&M faculty position because of unlawful discrimination, and the

1

undisputed record shows, instead, that before and during the proceedings below,

the one school where Lowery purports to want to apply (someday) made six hires

for tenured or tenure-track positions and selected two white men, one Asian man,

and three Asian women. ROA.324-25 (¶ 8). Lowery ignores these facts and urges

that the district court erred by declining to issue an advisory opinion based on

vague alleged statements and discontinued programs that could never have affected

him. But "[a] foundational principle of Article III is that 'an actual controversy

must exist . . . through all stages of the litigation,'" *Trump v. New York*, 592 U.S.

125, 131 (2020), and "courts have 'no business' deciding legal disputes or

expounding on law in the absence of such a case or controversy," *Already, LLC v.

Nike, Inc.*, 568 U.S. 85, 90 (2013).

Moreover, Lowery also failed to establish Article III jurisdiction because, as

the district court also correctly found, the intervening enactment of a state statute—

Texas Senate Bill 17 ("SB 17")—mooted most of his claims and rendered the rest

unripe. That law, which was passed in May 2023 and became effective in January

2024, requires all public universities in Texas, including A&M, to ensure that they

do not (1) "establish or maintain a diversity, equity, and inclusion office";

(2) "compel, require, induce, or solicit any person to provide a diversity, equity,

and inclusion statement or give preferential consideration to any person based on

the provision of a diversity, equity, and inclusion statement"; or (3) "give

2

preference on the basis of race, sex, color, ethnicity, or national origin to an applicant for employment, an employee, or a participant in any function of the institution." Tex. Educ. Code § 51.3525(a), (b)(1)(A)-(D). As the district court held, SB 17 made Lowery's already hypothetical case even more premature, and there is no basis to credit Lowery's sheer speculation that A&M will ignore the new law.

Nonetheless, in the unlikely event that Lowery could both prove an imminent threat of a concrete injury despite SB 17, as well as plausibly allege (subject to Rule 11) that such an injury were traceable to an actual violation by A&M of SB 17 and federal law, nothing would prevent him from bringing such a claim, even today. As the district court emphasized twice in its opinion, its jurisdictional dismissal was ***without prejudice*** and "in no way precludes Lowery from bringing later action based on future practices of Texas A&M after implementation of new policy under SB 17." ROA.781; *see also id*. ("There is certainly time and place enough for Lowery to bring further action if Texas A&M continues what he believes to be unconstitutional hiring practices. And nothing here should be construed to preclude later action on future facts."). Should such a concrete case or controversy ever arise—and the record supplies no reason to believe it ever would—the district court, and this Court if necessary, could

consider it. But at this time, Article III plainly prevents a federal court from issuing an advisory opinion on a non-existent controversy.

## STATEMENT OF THE ISSUES

1.      Whether the district court erred in finding, on a factual record presented under Rule 12(b)(1), that Lowery failed to establish standing to seek an injunction to redress an imminent threat of a concrete injury in fact traceable to A&M's actions as set forth in his complaint.

2.      Whether the district court erred in finding, in the alternative, that the enactment of SB 17 either mooted Lowery's claims or rendered them unripe.

3.      Whether the district court abused its discretion in deciding appellees' Rule 12(b)(1) motion based on the existing factual record, where Lowery had agreed to stay discovery pending a ruling on appellees' motion to dismiss, never sought to vacate that agreed stay, and made no showing that discovery was necessary for him to carry his affirmative burden of proving jurisdiction.

4.      Whether the district court abused its discretion in declining to allow Lowery to file an amended or supplemental complaint adding allegations directed solely to mootness, and instead dismissing Lowery's claims for prospective relief without prejudice to Lowery filing a new complaint if he could plausibly allege new facts to prove Article III jurisdiction.

## STATEMENT OF THE CASE

**A.    Factual Background.**

**1.    A&M's Hiring Practices Before Enactment of SB 17.**

Texas A&M University is a public institution of higher education.  ROA.162
(¶ 4).  It is part of the Texas A&M University System (the "A&M System"), along
with ten other universities, eight state agencies, and a health science center.
ROA.137.  As a state entity, A&M is "under the management and control of the
board of directors of The Texas A&M University System" (the Board of Regents),
whose general powers and duties are prescribed by statute. Tex. Educ. Code
§ 86.02; *see also id.* §§ 85.11, 85.21, 86.11.

A&M is home to more than fifteen separate colleges and schools.  ROA.315.
This case involves just one of them—the Mays Business School ("Mays"), to
which Lowery alleges he might someday apply.  ROA.170-71 (¶¶ 39-44).

Even before SB 17's enactment, A&M had an equal opportunity
employment policy governing hiring decisions at ***all*** of its colleges and schools.
*See* ROA.220; ROA.227; ROA.323-24 (¶¶ 4-7).  A&M also administered a
number of fellowship programs at ***participating*** colleges and schools.

One of those programs, ACES Fellows, was a faculty hiring program for
"early career PhDs" (*i.e.*, those within four years of earning their degrees).
ROA.225.  ACES Fellows was launched in 2018, ROA.323 (¶ 4), and it

"promote[d] the research, teaching, and scholarship of early career scholars who embrace[d] the belief that diversity is an indispensable component of academic excellence," ROA.224.  Applicants of all races, ethnicities, and genders were eligible to apply, and all hiring decisions were made in accordance with A&M's equal employment opportunity policy.  ROA.227; ROA.323 (¶ 4).  ACES Fellows were to be recruited only by colleges and schools that opted to participate in the program.  ROA.224.  But Mays never opted into ACES Fellows.  ROA.323 (¶ 4).

Another program, ACES Plus, was a proposed faculty hiring program at A&M for new mid-career and senior tenure-track professors.  ROA.177; ROA.323 (¶ 5).  Just as with ACES Fellows, ACES Plus Fellows were to be hired only by colleges and schools that elected to participate in the program—and, again, Mays never opted in.  ROA.323-24 (¶ 5).  ACES Plus was announced in a July 2022 memorandum.  ROA.177.  A December 2022 clarifying memorandum explained that "[t]he objective of ACES Plus [was] to recruit outstanding faculty members with records for research, teaching and/or scholarship in areas that promote campus diversity as an element of academic excellence."  ROA.220.  That memorandum stated that "[a]ll hiring decisions" would "be made on an equal employment opportunity basis, without regard to the applicant's race, gender or other protected classification, in full compliance with the Texas A&M policy on equal employment opportunity," and that "[q]ualified applicants [were] not limited

6

to underrepresented minority groups." *Id.* It also noted that no hires or offers for employment had been made under the program. *Id.*

In March 2023, Chancellor John Sharp issued guidance directing all institutions in the A&M System to remove diversity, equity, and inclusion ("DEI") statements from their employment or admission practices. ROA.327-30. The guidance "create[d] a uniform System-wide policy on recruitment, hiring and related activities" and "standardized faculty application components" by limiting them to (i) an employment application, (ii) a cover letter, (iii) a curriculum vitae, (iv) a personal statement on philosophy and plans for research, teaching, and service, as applicable, and (v) professional references. *Id.*

### 2. Plaintiff Richard Lowery.

Richard Lowery is a tenured associate professor of finance at UT's McCombs Business School. ROA.162 (¶ 3); ROA.169 (¶ 35). He professes an interest in someday applying for a teaching position in the Department of Finance at Mays. ROA.170 (¶ 39); ROA.171 (¶¶ 43-44). He affirmatively says he ***will not apply***, however, "until [he] can compete on an even playing field with female faculty candidates and faculty candidates of other races," given what he believes to be "discriminatory hiring practices" at A&M. ROA.308 (¶ 12).

At the same time, Lowery is actively suing his current employer, UT, for a permanent injunction barring the university from "reducing his pay, removing his

7

job responsibilities, removing his affiliation with the Salem Center" (*i.e.*, the Salem
Center for Policy, an academic institute within McCombs), or "engag[ing] in any
other adverse employment action."  ROA.233 (¶ 3); ROA.254-55 (¶ A).  In that
litigation, Lowery has filed sworn declarations affirming that his annual appointment
to the Salem Center was renewed on September 19, 2022, ROA.353, and that he
does not want to lose that affiliation, ROA.349 (¶¶ 61-62); ROA.358 (¶ 12).

Lowery also actually applied for a faculty appointment at the University of
Florida ("UF"), even though UF maintained a public webpage describing its own
DEI programs at the time.  ROA.197-98; ROA.215-16 (¶¶ 5-7); ROA.258-61; *see
also* ROA.308-09 (¶¶ 16-17); ROA.830 (39:14-22).  That page linked to an array
of DEI-related resources, including the site of UF's "Chief Diversity Officer," a
"member of the president's cabinet" charged with "chart[ing] [UF's] inclusive
excellence strategy."  ROA.263-64.  UF also hosted an official "Anti-Racism" site
that listed "Representation" as a "Central Initiative" and tasked university
leadership with "intensify[ing] our efforts in recruiting, supporting and retaining
our students, faculty and employees of color."  ROA.266-68.

## B.    The District Court Proceedings.

### 1.    Lowery's Complaint and Amended Complaint.

Lowery initiated this action on September 10, 2022.  ROA.13-24.  He named
as defendants the A&M System, its Regents in their official capacities, Annie

8

McGowan in her official capacity as Vice President and Associate Provost for
Diversity at A&M, and N.K. Anand in his official capacity as Vice President for
Faculty Affairs at A&M.  ROA.13.

The parties agreed to stay discovery, as well as briefing on Lowery's motion
for class certification, pending the resolution of dispositive motions.  ROA.129.
The district court entered an order enforcing this agreement and directing that
"[d]iscovery in this matter is hereby STAYED pending ruling on Defendants'
Motion to Dismiss."  *Id.*

After appellees moved to dismiss, ROA.131-54, Lowery filed an amended
complaint on December 23, 2022, ROA.161-79, dismissing all claims against the
A&M System and its Regents, ROA.180, and adding as defendants Texas A&M
University, M. Katherine Banks in her official capacity as president of A&M, and
Alan Sams in his official capacity as interim provost and vice president for
academic affairs at A&M.  ROA.162 (¶¶ 4-6).

Lowery alleged that A&M, "along with nearly every university in the United
States, discriminates on account of race and sex when hiring its faculty, by giving
discriminatory preferences to females and non-Asian racial minorities at the
expense of white and Asian men."  ROA.162 (¶ 9).  He attributed these
"discriminatory, illegal, and anti-meritocratic practices" to "the so-called diversity,
equity, and inclusion offices at public and private universities throughout the

United States" and charged that the very "existence" of these offices "is subverting

meritocracy and encouraging wholesale violations of civil-rights laws." ROA.163

(¶ 11). As purported support for these blanket allegations, Lowery cited a handful

of hiring initiatives and employment-related events that he alleged to have taken

place at various times at various colleges and schools within A&M, namely:

- A directive allegedly issued by Banks, in her former capacity as dean of the College of Engineering, that "all new tenure-track hires in the college must be 'underrepresented minorities,'" and her alleged practice as dean of giving departments "new faculty openings that could be filled only by 'underrepresented minorities' or women." ROA.163 (¶ 13).

- The original memorandum announcing ACES Plus. ROA.163-64 (¶ 15). Lowery never acknowledged the clarifying memorandum, even though he received it before filing his amended complaint. ROA.194-95; ROA.214-15 (¶ 1); ROA.220.

- An email exchange on August 26, 2022 between an unidentified faculty member at Mays and Shane A. Johnson, a finance professor at Mays whom Lowery alleged to be head of the recruiting committee for the Department of Finance for the 2022-23 academic year. ROA.165 (¶ 20). In that exchange, the unidentified professor wrote to Johnson that they "heard from someone that one of our lines is reserved for an 'underrepresented minority'" and asked whether that was correct. ROA.179. In response, Johnson wrote: "The underrepresented line would potentially be a third position, so yes reserved, but not one of our 'regular' positions." *Id.*

- A resolution adopted by the A&M Faculty Senate—a purely advisory body—in October 2022 "reconfirm[ing] its commitment to diversity, equity, and inclusion efforts" and "support[ing] the goals of programs, such as ACES and ACES Plus, that aim to diversify the ranks of faculty to better represent our state and our student body," and statements by a Faculty Senator referencing "DEI initiatives" and "coordinating board initiatives." ROA.165-67 (¶¶ 23-29).

- The ACES Fellows program, under which, Lowery alleged, A&M would "reserve hiring spots for underrepresented-minority candidates." ROA.167-68 (¶ 30).

Lowery alleged that "[t]he pervasive and ongoing use of race and sex preferences and set-asides at [A&M] prevents [him] from competing with other applicants for these faculty positions on an equal basis." ROA.171 (¶ 45). "This," he said, "inflicts injury in fact," charging that "[t]his injury is caused by [A&M's] pervasive and ongoing use of race and sex preferences and set-asides in faculty hiring, and it will be redressed by a declaratory judgment and injunction that bars the university from considering race or sex when appointing or compensating its faculty." ROA.171 (¶ 46).

As relief, Lowery requested a declaration that defendants were violating Title VI, Title IX, 42 U.S.C. § 1981, and the Equal Protection Clause "by discriminating in favor of women and non-Asian racial minorities in the appointment, promotion, and compensation [of] faculty"; a permanent injunction barring defendants "from considering race or sex in the appointment, promotion, or compensation of [A&M's] faculty"; the appointment of a court monitor "to oversee all decisions relating to the appointment, promotion, and compensation of faculty" at A&M and a judicial pre-clearance regime for "all [such] decisions"; and the appointment of a court monitor "to oversee the 'diversity office'" at A&M. ROA.174-75 (¶ 66). He sought exclusively prospective relief and made no request

11

for damages of any kind. *See id.*; *see also* ROA.294 ("The relief that Mr. Lowery requests is prospective in nature, and he is not seeking money damages or retrospective relief." (citing ROA.174-75 (¶ 66))).

### 2. Appellees' Motion to Dismiss.

Appellees moved to dismiss Lowery's first amended complaint on February 10, 2023. ROA.186-210. In addition to invoking sovereign immunity and contesting Lowery's ability to state a claim, appellees mounted a factual attack on subject-matter jurisdiction. ROA.198-99.

Appellees presented evidence that, among other things:

- Lowery's appointment to the Salem Center at UT had been renewed just *nine days* after he filed this lawsuit. ROA.314; ROA.353.

- Lowery was suing UT to enjoin it from "removing his affiliation with the Salem Center" or "engag[ing] in any other adverse employment action." ROA.197; ROA.254-55 (¶ A).

- Under A&M System Policy 12.04, the A&M Faculty Senate serves in a purely "advisory capacity" to the president. ROA.222.

- The ACES Plus program was race- and gender-neutral and had yielded no hires, and Mays had never elected to participate in it. ROA.220; ROA.315; ROA.323-24 (¶ 5).

- The ACES Fellows program was race- and gender-neutral and was limited to "early career PhDs," and Mays had never elected to participate in it either. ROA.224-27; ROA.315; ROA.323 (¶ 4).

- Faculty applications had been standardized across the A&M System, including by banning DEI statements. ROA.324 (¶ 6); ROA.327-30.

- In accordance with A&M and A&M System policies and guidance, all faculty hiring decisions at Mays were based on the approved application components, and no position or faculty line at Mays was "reserved" for members of underrepresented minority groups. ROA.324 (¶ 7).

- Between July 2022, when the ACES Plus program was announced, and March 2023, when appellees filed their dismissal reply brief, Mays posted eight tenured or tenure-track faculty openings and made six hires—two white men, one Asian man, and three Asian women. ROA.324-25 (¶ 8).

In response, Lowery offered only his own declaration. ROA.306-10. He claimed that he applied to UF, notwithstanding its promotion of its Chief Diversity Officer and its Anti-Racism initiatives, because he "expect[ed] that Florida w[ould] soon get rid of DEI at public universities" and the position he sought "was at a college that was set up to be free of DEI." ROA.309 (¶ 17). He also denied that his lawsuit against UT "indicates that [he] intend[s] to stay there." ROA.309-10 (¶ 20). And he closed by calling A&M—to which he still asserted a desire to apply—"awful." ROA.310 (¶ 21).

Meanwhile, Lowery never served discovery requests on appellees or filed a motion to vacate the district court's order staying discovery.

The district court scheduled a hearing on appellees' motion to dismiss for May 31, 2023. ROA.364. Three days before the hearing, the Texas Legislature passed SB 17. ROA.365; ROA.377. The bill amended the Texas Education Code in a manner that aligned with much of Lowery's prayer for relief. ROA.371.

13

Under the new law, beginning January 1, 2024, the governing board of any public institution of higher education (including A&M) "shall ensure that each unit of the institution" does not, "except as required by federal law": (1) "establish or maintain a diversity, equity, and inclusion office" as defined in the statute, either directly or through a third party; (2) "compel, require, induce, or solicit any person to provide a diversity, equity, and inclusion statement or give preferential consideration to any person based on the provision of a diversity, equity, and inclusion statement"; or (3) "give preference on the basis of race, sex, color, ethnicity, or national origin to an applicant for employment, an employee, or a participant in any function of the institution."  ROA.371-73; Tex. Educ. Code § 51.3525(a), (b)(1)(A)-(D).  Appellees advised the district court of SB 17 and its effect on the justiciability of Lowery's claims, ROA.365-77, and Lowery promptly responded, ROA.378-82.

At the motion hearing, the parties refined the issues and further developed the record.  As to SB 17, Lowery's counsel agreed with the district court that the new law "seems to get a long way to where you're arguing as a policy matter on what education policy ought to be in the state," observing that, with respect to faculty hiring, "[i]t specifically says in the bill that there's to be no consideration of race or sex, which is exactly what we're suing over."  ROA.821 (30:11-18).  Lowery's counsel likewise acknowledged that "SB 17 certainly changes the

playing field," and "if there's no more case or controversy because the university is

doing what we want, there's no need for the Court to be involved," adding that "we

have no desire to waste the Court's time or seek an advisory opinion."  ROA.834

(43:8-12, 43:19-20).

As to Lowery's standing to seek prospective relief, Lowery's counsel

averred that he could prove Lowery's intentions but maintained that it was

unreasonable to require him to prove "all the elements of Article III standing" as a

factual matter at that time.  ROA.827 (36:3-10).  Indeed, Lowery's counsel

conceded that Lowery could not "identify any actual victim of the discriminatory

policy that [he's] asserting," even "[in] terms of showing that there's a problem

here or that there's a well-founded fear."  ROA.828-29 (37:25-38:5, 38:14-21).

Lowery's counsel also admitted that UF's website included pages describing the

university's DEI programs when Lowery submitted his application.  ROA.830

(39:14-22).  Meanwhile, appellees' counsel noted that appellees had denied the

factual predicate of Lowery's claim of injury in fact (*i.e.*, an alleged discriminatory

hiring policy at A&M that could affect Lowery):  "There is no policy here to

discriminate and have preferences for racial minorities."  ROA.840 (49:6-10).

After the hearing, the district court ordered the parties to confer and submit a

joint status report on "the potential for resolution or deferral of this dispute in light

of" SB 17. ROA.383-84. The parties could not reach agreement, and the district court permitted supplemental briefing on SB 17's effect on the case. ROA.385-88.

Appellees argued that the enactment of SB 17 rendered Lowery's claims non-justiciable, ROA.390-94, and presented evidence that A&M was actively evaluating its policies, offices, and operations to ensure compliance with the new law by September 1, 2023—four months before it was set to take effect. ROA.399. In fact, on August 16, 2023, the A&M System approved revisions to System Policy 08.01, setting the framework for member institutions' implementation of SB 17. Tex. A&M Univ. Sys. Policy No. 08-01 (2023) (https://policies.tamus.edu/08-01.pdf).[1] Among other things, System Policy 08.01 provides for equal employment opportunity, bars any form of discrimination based on race or sex, prohibits the existence of any DEI office and the performance of DEI functions (as defined in SB 17), and establishes an SB 17 compliance system. *Id.* §§ 1.1, 2.1, 2.2, 4.4.

In his supplemental brief, Lowery suggested for the first time that he "be allowed an opportunity for discovery," based in part on the erroneous premise that

---

[1]    The Court may take judicial notice of current A&M System Policy 08.01. It is a matter of public record that bears on mootness, *Duarte ex rel. Duarte v. City of Lewisville, Tex.*, 759 F.3d 514, 517 (5th Cir. 2014), and "'[i]t is the duty of counsel to bring to [this Court's] attention, "without delay," facts that may raise a question of mootness,'" *Staley v. Harris Cnty., Tex.*, 485 F.3d 305, 313 (5th Cir. 2007) (en banc) (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.23 (1997)) (first alteration in original).

appellees did not raise a factual challenge to subject-matter jurisdiction until their reply brief. ROA.401. *But see* ROA.488-89. He then "denie[d] that the defendants intend to comply with SB 17" and offered what he characterized as "evidence that casts doubt on whether the university will implement the color-blind and sex-neutral hiring practices required by SB 17." ROA.401-02. That evidence was a description of A&M's 2020-2025 Strategic Plan that remained visible on the university's website; a misleading excerpt of McGowan's remarks on diversity statements at a February 14, 2023 Faculty Senate meeting; a February 22, 2023 essay in *The American Mind* allegedly showing that A&M "continued to encourage the use of DEI statements in faculty statements"; and a June 15, 2023 post on *Texas Scorecard* reporting on the potential hiring of Kathleen McElroy to lead A&M's journalism program. ROA.402-04; ROA.406-11.

In their supplemental response brief, appellees observed that Lowery had never provided any indication of the discovery he supposedly needed to oppose dismissal under Rule 12(b)(1). ROA.490. Appellees also submitted a complete transcript of the discussion of diversity statements at the February 14, 2023 Faculty Senate meeting, where multiple Senators confirmed that diversity statements, like hiring decisions, did not take the applicant's race or gender into consideration, as well as a July 11, 2023 article in *The Bryan-College Station Eagle* reporting that McElroy had decided ***not*** to join A&M. ROA.492; ROA.496-511.

Lowery simultaneously filed his supplemental response brief and a motion for leave to file a second amended complaint.  ROA.512-14; ROA.610-14.  Leave to amend, Lowery said, was warranted so he could "add factual allegations showing that an Article III case or controversy continues to exist despite the enactment of Senate Bill 17 and the Supreme Court's recently announced ruling in *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*."  ROA.512.  Lowery confirmed that he was "not amending any of his allegations related to Article III standing, sovereign immunity, or his supposed failure to state a claim on which relief may be granted," and he denied that appellees would be prejudiced "because the new allegations concern only whether the case has become moot."  ROA.513.  Lowery's new allegations recounted the same events described in his supplemental brief, plus an account of a "recent dean-search committee" at Mays that allegedly had been "pressured by the university administration"—in October 2022—"to interview underqualified female and minority candidates."  ROA.528-31; ROA.573 (¶ 6).  The work of that search committee was described in a declaration by Adam Kolasinski, a professor at Mays, and a string of his heavily redacted emails.  ROA.619-52.  Lowery's supplemental response brief referred to his proposed second amended complaint and suggested that rather than dismissing the case as unripe, the district court should allow "discovery into Texas A&M's compliance efforts."  ROA.614.

18

Lowery then submitted a series of what he called "notices" to the district court. The first notice informed the district court of McElroy's decision not to join A&M, given the reaction to her past work at *The New York Times* and her past statements about diversity, equity, and inclusion, as well as Banks's subsequent resignation as president of A&M. ROA.654-95. Lowery argued that the case could not be dismissed as moot "when the university's leadership remains in limbo and it is impossible to know whether the incoming regime intends to comply with SB 17." ROA.658. The second notice submitted a July 26, 2023 email from A&M's interim president, Mark Welsh, to "Members of the Aggie Family" acknowledging recent news coverage and expressing that "diversity in all its forms is a strength." ROA.696-700. The third notice submitted another declaration from Kolasinski, this one describing his July 31, 2023 reappointment letter, which referenced "contributions to Texas A&M diversity and inclusion goals." ROA.702-11. The fourth notice submitted excerpts of Welsh's remarks at an August 14, 2023 A&M Faculty Senate meeting, describing the effect of SB 17 and his belief that "we can actually comply with the law." ROA.742-43. The fifth notice submitted excerpts of Welsh's remarks at a virtual all-faculty-and-staff meeting on August 15, 2023, referencing "efforts to attract faculty of color," expressing that "diversity is a strength" and "equity is just a way we ought to live our lives," and describing the university president as "kind of the chief

everything," including "chief diversity officer," "chief strategist," and "chief spokesperson." ROA.747-48.

Appellees opposed leave to amend. ROA.712-27. They pointed out that Lowery's proposed new allegations centered on events that ***predated*** SB 17 and *Students for Fair Admissions*, and so had no logical bearing on mootness—the sole purpose for which Lowery offered them. ROA.716. Appellees also presented evidence that the dean search described by Kolasinski had culminated in the hiring of a white man, and noted that this information was available to Lowery when he filed his first amended complaint. ROA.716-17; ROA.724-27. As appellees explained, Lowery's filings only "underscore[d] the rapidly changing landscape at the university that render[ed] Plaintiff's claims unripe and render[ed] judicial intervention especially inappropriate." ROA.717-18.

On reply, Lowery defended his proposed pleadings strictly on mootness grounds, ROA.730-32; ROA.734, and denied that he or his counsel actually knew the facts recounted in Kolasinski's declarations when Lowery filed his first amended complaint, ROA.733. Lowery conceded, however, that he "was vaguely aware that someone at Texas A&M was boosting an unqualified minority candidate to be dean of the Mays Business School." ROA.741 (¶ 5).

## C.    The District Court's Jurisdictional Dismissal.

The district court granted appellees' motion to dismiss under Rule 12(b)(1) in an opinion and order dated September 29, 2023.  ROA.768.  Recognizing that appellees had factually attacked subject-matter jurisdiction, the district court considered the evidence offered by both parties.  ROA.773.

The court first held that Lowery lacked standing because he had failed to establish an injury in fact, regardless of the plausibility of his professed intent to apply to A&M once its alleged discriminatory practices ceased.  ROA.776.  The court found that Lowery could not show "the actual or imminent injury of which he complains via [the ACES Plus and ACES Fellows programs] for the very reason that the Mays Business School doesn't participate in them."  ROA.774-75.  The court also found that Lowery's allegations concerning a "reserved" faculty hiring line at Mays did not indicate that "such a hiring line is (or was) *currently* in place" and so did not "speak of current practices or establish present injuries."  ROA.775.  In addition, the court found that the A&M Faculty Senate's actions cited by Lowery were not "indicative of any current actions even being pursued at the Mays Business School" and so "fail[ed] to connect to any injury in fact."  *Id.* Accordingly, the court reasoned, "Lowery fail[ed] to show that, as a prospective applicant to Mays Business School, he would be impacted by any of the preferential-treatment programs that Texas A&M faculty and leadership have

allegedly deemed important and elsewhere—prior to SB 17—attempted to

advance."  ROA.776.

It was against this backdrop that the court faulted Lowery for "simply

assum[ing] the conclusion" (*i.e.*, "that ongoing discrimination exists and is injuring

him") and observed that Lowery's position would "substantially rewrit[e] Article

III standing for employment-discrimination claims" by allowing "any putative

plaintiff [to] sue a potential employer without ever applying, simply upon

allegation the posited discriminatory practices deterred application."  ROA.773.

Next, acknowledging that SB 17 represents "a substantial change in

applicable law," and "prohibits exactly what Lowery alleges is taking place" at

A&M, the court held that "the relief that Lowery seeks as to past practices is moot,

and the relief that he seeks prospectively isn't ripe."  ROA.777.  Regarding past

practices, the court found it "beyond reasonable argument that Texas A&M must

review its hiring practices and revise them where necessary to bring them into

accord with SB 17 and *Students for Fair Admissions*," and, as a result, "the claims

as originally presented have lost their practical significance because the facts

generating the original controversy have altered so substantially."  ROA.777-78.

Regarding future conduct, the court found that "[a] challenge to [A&M's] practices

will only be appropriate, if ever, after SB 17 actually takes effect."  ROA.779.

Finally, the court denied Lowery leave to amend as futile, explaining that "[t]he proposed amendments simply reiterate much of what Lowery has included in supplemental briefing" on justiciability and "do nothing to overcome the above conclusions with respect to ripeness and standing." ROA.781. The court expressly considered Lowery's notices and found that they did not change the analysis, "for what's lacking is actual implementation and experience under the law as now proscribed." *Id.*

The court was clear, however, that its dismissal was without prejudice, stressing that "[t]here is certainly time and place enough for Lowery to bring further action if Texas A&M continues what he believes to be unconstitutional hiring practices." *Id.*

## SUMMARY OF ARGUMENT

1.    The district court did not err in dismissing Lowery's claims for lack of Article III standing. All of Lowery's claims rested on a common factual premise: that Lowery stood "able and ready" to apply for a faculty appointment at one of A&M's more than fifteen colleges and schools (Mays), but discriminatory hiring practices currently in place at A&M prevented him from competing for a position at Mays on equal footing with female, non-white, and non-Asian applicants. Confronted with that allegation, appellees raised a factual attack on subject-matter jurisdiction under Rule 12(b)(1) by submitting evidence demonstrating that (1)

23

none of the alleged practices could possibly affect Lowery, let alone subject him to unconstitutional discrimination, as a potential mid-career applicant to Mays and (2) Lowery was not actually poised to apply to Mays "in the reasonably imminent future," but rather was using "some day intentions" to "vindicate his view of the law," *Carney*, 592 U.S. at 64. Lowery offered no countervailing evidence beyond his own assertions in a declaration that he was indeed interested in applying to Mays, notwithstanding his ongoing prospective litigation against UT and his application to UF despite its diversity initiatives akin to those he condemned at A&M. Weighing that evidence, as this Court's precedents allow, the district court found that Lowery "fail[ed] to show that, as a prospective applicant to Mays Business School, he would be impacted by any of the preferential-treatment programs" cited in his complaint. ROA.776. That factual finding—that Lowery had not shown an injury in fact—was not clearly erroneous. Nor did the district court err in determining that Lowery could not base his standing to seek prospective relief on his stated intention to apply to Mays, absent proof of an actual discriminatory barrier that had been applied or certainly would be applied to him. A contrary ruling would upend decades of precedent and open the floodgates to speculative employment-discrimination lawsuits against any entity by any purportedly aggrieved member of the public.

24

2.     The district court did not err in finding, in the alternative, that
Lowery's claims were mooted or rendered unripe by the enactment of SB 17.
When SB 17 became law in May 2023, Lowery received the very relief he asked
the district court to award him by way of a prohibitory injunction and a court
monitor.  Not only did the new law ban DEI offices, diversity statements, and race-
or gender-based preferences of any kind at public universities, it also created a
comprehensive oversight regime including annual compliance certifications and
periodic audits tied to state funding.  In view of these requirements, which were set
to take effect in January 2024, A&M launched a review of its policies and
programs in June 2023, with the goal of achieving compliance by September 2023.
The district court considered this evidence and correctly found that Lowery's
claims based on acts proscribed by SB 17 had become moot and that Lowery's
claims for prospective relief were unripe because they would depend on as-yet
undeveloped facts surrounding A&M's hiring practices after the implementation of
the new law.  The court properly rejected Lowery's efforts to invoke the voluntary
cessation doctrine, as any "cessation" was the product of legislative action, and
even if that doctrine did apply, A&M and its officials were entitled to a
presumption of good faith as state agents.  The court was also right to dismiss
Lowery's claims without prejudice, rather than accepting his conjecture that A&M

would not comply with SB 17, given the changes afoot at A&M and Lowery's right to bring new claims at any time upon proof of an actionable violation of law.

3.    The district court did not abuse its discretion by deciding appellees' Rule 12(b)(1) motion on the existing factual record.  Lowery had ample opportunity to "develop and argue the facts" relevant to Article III standing, *Williamson v. Tucker*, 645 F.2d 404, 414 (5th Cir. 1981), as he submitted a sworn declaration attesting to his interest in Mays and his purported injury at the hands of A&M notwithstanding his lawsuit against UT and his application to UF.  He was entitled to nothing more, both because (1) he waived discovery by agreeing to a stay pending the resolution of appellees' motion to dismiss and by foregoing any formal request for discovery or for vacatur of the stay and (2) he never identified the discovery he needed to resist dismissal, particularly with respect to standing.

4.    The district court did not abuse its discretion by denying Lowery leave to file an amended or supplemental complaint.  In the wake of the motion-to-dismiss hearing, and amid the parties' supplemental briefing on justiciability, Lowery moved for leave to file a new complaint adding allegations that he repeatedly and consistently characterized as relevant to mootness alone.  Each of the new allegations described events that supposedly occurred in 2023, before SB 17 took effect, with one exception—the work of a dean-search committee at Mays in October 2022, which Lowery neglected to mention had yielded the selection of a

white male candidate.  The district court correctly found that the proposed

amendments "d[id] nothing to overcome" the standing and ripeness defects in

Lowery's claims because the allegations were silent as to "actual implementation

and experience" under SB 17.  ROA.781.  Moreover, the district court was well

within its discretion to deny leave in light of the evidence that at least some of the

newly alleged facts were available to Lowery when he filed his first amended

complaint.  And, in any event, Lowery has suffered no prejudice because the court

made clear that its decision in no way impeded Lowery from filing a new suit on

facts showing an actual case or controversy—an invitation that Lowery has not

accepted to this day.

## STANDARDS OF REVIEW

A dismissal for lack of subject-matter jurisdiction under Rule 12(b)(1) is

reviewed de novo, applying the same standard as the district court.  *In re S.

Recycling, LLC*, 982 F.3d 374, 379 (5th Cir. 2020).  The plaintiff bears the burden

of proving subject-matter jurisdiction by a preponderance of the evidence.  *Id.*  The

district court's findings on any disputed jurisdictional facts in a Rule 12(b)(1)

factual attack are reviewed for clear error.  *Id.*; *accord Kling v. Hebert*, 60 F.4th

281, 284 (5th Cir. 2023).

Discovery rulings, including denials of jurisdictional discovery, are

reviewed for abuse of discretion and will be reversed only when arbitrary or clearly

27

unreasonable.  *S. Recycling*, 982 F.3d at 386; *Freeman v. United States*, 556 F.3d 326, 341-42 (5th Cir. 2009).

The denial of leave to file an amended or supplemental complaint is reviewed for abuse of discretion.  *New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries*, 56 F.4th 1026, 1034 (5th Cir. 2023); *Burns v. Exxon Corp.*, 158 F.3d 336, 343 (5th Cir. 1998).

## ARGUMENT

## I.     THE DISTRICT COURT DID NOT ERR IN DISMISSING LOWERY'S CLAIMS FOR LACK OF STANDING.

"Article III standing is 'not merely a troublesome hurdle to be overcome if possible so as to reach the "merits" of a lawsuit which a party desires to have adjudicated; it is a part of the basic charter promulgated by the Framers of the Constitution at Philadelphia in 1787.'"  *United States v. Texas*, 599 U.S. 670, 675 (2023) (citations omitted).  "Article III standing requires three elements: (1) an 'injury in fact' that is (2) 'fairly traceable' to the 'conduct complained of' and that is (3) likely redressable by a favorable court decision."  *Earl v. Boeing Co.*, 53 F.4th 897, 901 (5th Cir. 2022).  As the district court recognized, the first element is dispositive of Lowery's claims.

An injury in fact must be "(a) concrete and particularized and (b) actual or imminent."  *Campaign Legal Ctr. v. Scott*, 49 F.4th 931, 935 (5th Cir. 2022) (footnotes omitted).  "That means a claimed injury must be real—'it must actually

exist.' And it must not be 'too speculative for Article III purposes.'" *Earl*, 53 F.4th at 902 (citations omitted). In addition, "[f]or an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016).

What's more, "plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021), and where, as here, a litigant requests prospective injunctive or declaratory relief, he "must demonstrate 'continuing harm or a real and immediate threat of repeated injury in the future,'" *James v. Hegar*, 86 F.4th 1076, 1081 (5th Cir. 2023). "The threat of future injury must be '***certainly*** impending'; mere allegations of possible future injury will not suffice." *James*, 86 F.4th at 1081. Rather, "there must be at least a 'substantial risk' that the injury will occur." *Stringer v. Whitley*, 942 F.3d 715, 721 (5th Cir. 2019); *cf. Attala Cnty., Miss. Branch of NAACP v. Evans*, 37 F.4th 1038, 1043 (5th Cir. 2022) ("We see no necessary difference between the concepts of a substantial risk and a real and immediate threat, though immediacy does imply a short timeframe.").

### A.    The District Court Did Not Clearly Err in Finding that Lowery Failed to Prove that the Statements and Practices Alleged in His Complaint Posed an Imminent Threat of a Concrete and Particularized Injury to Him.

As the district court observed, Lowery's lone claimed injury in fact was the loss of an opportunity to compete on equal footing with non-white, non-Asian, and

non-male applicants for faculty positions at A&M's Mays Business School. ROA.769; ROA.773-74. The factual basis of that claim was the allegedly discriminatory hiring practices that Lowery cited in his pleadings. *See* ROA.171 (¶¶ 45-46). And the relief sought was exclusively prospective. ROA.770; *see also* ROA.294. Invoking their right to factually attack subject-matter jurisdiction under Rule 12(b)(1), and noting that Lowery expressed interest **only** in applying to Mays, A&M submitted undisputed evidence showing that Lowery **himself** did not face any concrete, particularized, actual, or imminent injury from the challenged practices.

In particular, A&M demonstrated that:

- The ACES Plus program was race- and gender-neutral, had yielded no hires, and had never been adopted by Mays. ROA.220; ROA.315; ROA.323-24 (¶ 5).

- The ACES Fellows program was race- and gender-neutral, was limited to "early career PhDs," and had never been adopted by Mays. ROA.224-27; ROA.315; ROA.323 (¶ 4).

- In accordance with A&M and A&M System policies and guidance, all faculty hiring decisions at Mays were based on the approved application components, and no position or faculty line at Mays was "reserved" for members of underrepresented minority groups. ROA.324 (¶ 7).

- Between the announcement of the ACES Plus program in July 2022 and the filing of appellees' Rule 12(b) reply brief in March 2023, Mays had posted eight tenured or tenure-track faculty openings and made six hires—two white men, one Asian man, and three Asian women. ROA.324-25 (¶ 8).

- A&M System Policy 12.04 dictates that the A&M Faculty Senate serves in a purely "advisory capacity" to the president. ROA.222.

30

Lowery made no effort to controvert this evidence. Tellingly, Lowery had at least one source on A&M's faculty—Kolasinski, who taught at Mays and served as a Faculty Senator, no less—and so was in a position (subject to Rule 11) to at least raise a factual dispute over the scope of ACES Plus and ACES Fellows, the actual hiring practices at Mays, or the authority of the Faculty Senate. Lowery chose not to, maintaining that he did not need to prove "all the elements of Article III standing" in response to a Rule 12(b)(1) challenge and could simply rest on his allegation that "there's a discriminatory policy that prevents him from seeking employment on an equal basis." ROA.827 (36:3-10); ROA.828 (37:18-23).

The district court considered the record evidence and correctly found that Lowery indeed had "fail[ed] to show that, as a prospective applicant to Mays Business School, he would be impacted by any of the preferential-treatment programs" at issue. ROA.776. That finding was not clearly erroneous. Lowery's only appellate argument on this score is that the district court "quot[ed] Professor Johnson out of context," claiming that the redacted email attached to his first amended complaint "describes an actual faculty-hiring line currently in existence that is 'reserved' for underrepresented minorities," and that, as a result, "[t]here is no uncertainty that this 'reserved' faculty-hiring line exists." Appellant's Br. 36-37. The record shows otherwise. Johnson's email plainly stated that the hypothetical position would "potentially" be offered, not that it definitely would be

or had been.  ROA.179.  Thus, as the district court found, the email "speaks of future possibilities, not of future certainties," and did not establish that "such a hiring line is (or was) *currently* in place," ROA.775—a finding bolstered by a sworn declaration describing hiring at Mays, ROA.324 (¶ 7).

Lowery's remaining arguments are directed at other allegations in his pleadings and notices that he claims to evince ongoing discrimination at A&M as an undifferentiated whole.  Appellant's Br. 35-39.  Those allegations were all considered by the district court and found either (1) to not establish an imminent threat of a concrete injury in fact to Lowery, ROA.774-75 (ACES Plus, ACES Fellows, Faculty Senate actions), or (2) to be non-probative of "actual implementation and experience under the law as now proscribed," ROA.781 (facts presented in Lowery's supplemental briefing and notices).  Indeed, Lowery's counsel openly conceded that Lowery could not "identify any actual victim of the discriminatory policy that [he's] asserting," and he had not even "alleged" such facts to "show[] that there's a problem here or that there's a well-founded fear." ROA.828-29 (37:25-38:5, 38:14-21).

Because Lowery failed to prove a threatened future injury from the challenged practices that was (1) personalized, (2) concrete and particularized, and (3) actual or imminent, not conjectural or hypothetical, the district court properly dismissed his claims for prospective relief for lack of Article III standing.

*Stringer*, 942 F.3d at 721. That ruling was squarely in line with this Court's precedents. *See, e.g.*, *NAACP v. Tindell*, 95 F.4th 212, 216-18 (5th Cir. 2024) (plaintiffs lacked standing to enjoin a state statute creating a new municipal court that allegedly benefited a "disproportionately white population" because they failed to show injury in fact from the court's structure and its purported effect on plaintiffs' equal protection rights as local residents); *James*, 86 F.4th at 1081-82 (plaintiffs lacked standing to seek prospective relief directing officials to constitutionally administer unclaimed property law because they only claimed injury from past takings and "allege[d] no facts indicating that another taking" was "imminent or certainly impending"); *Campaign Legal Ctr.*, 49 F.4th at 937-39 (plaintiffs lacked standing to sue for violations of voter-registration statute because they "assert[ed] no cognizable injury in fact" from being denied the requested voter information and their "lack of 'opportunity' to identify voters" was "a speculative rather than concrete grievance"); *Attala Cnty.*, 37 F.4th at 1043-45 (plaintiffs lacked standing to sue prospectively over DA's alleged discriminatory jury-selection practices because they could not show "a 'real and immediate threat' or a 'substantial risk' that" the future injury-causing events "will occur to one of them"); *Stringer*, 942 F.3d at 721-23 (plaintiffs lacked standing to seek prospective relief from alleged violations of voter-registration statute because they

33

demonstrated only past injuries, sustained at the time of registration, and did not "establish[] a substantial risk" of future injuries).

Moreover, there can be no genuine dispute that Lowery lacks Article III standing to seek prospective relief from alleged discriminatory hiring practices at the more than fifteen colleges and schools at A&M *other than* Mays, given that Lowery has made no showing of any conceivable harm to him personally from the latter. *See James*, 86 F.4th at 1081 (plaintiffs that purport to represent a class "must still demonstrate that they personally have standing"); *Stringer*, 942 F.3d at 721 (whether compliance with federal law "would prevent future injury to others is irrelevant; plaintiffs seeking injunctive relief must show a continuing or threatened future injury to themselves").

### B. Lowery's Mere Statement of an Intent to Apply Is Insufficient to Establish His Standing to Seek Injunctive Relief.

Lowery's effort to cast the district court's analysis as legally flawed fares no better. *See* Appellant's Br. 29-35. The district court correctly recognized that a plaintiff challenging a discriminatory selection policy for a government program can establish standing by demonstrating that (1) he is "able and ready" to apply for that program *and* (2) the policy prevents him from competing on an equal basis. *See* ROA.773-74. While the district court needed only to reach the latter issue, Lowery made neither showing.

34

As to the first, the record evidence indicated that although Lowery professed a desire to apply to Mays, and had purportedly taken steps to generate interest there, he had no concrete intent to apply in the near future and had purposefully avoided applying. Indeed, he renewed his appointment to the Salem Center at UT within days of suing A&M, ROA.353, he readily applied to UF notwithstanding its own diversity initiatives that mirrored what his complaint against A&M attacked, ROA.258-68; ROA.830 (39:14-22), he sued UT to permanently protect his job, ROA.254-55 (¶ A); ROA.349 (¶¶ 61-62); ROA.358 (¶ 12), and he still has not applied to A&M even after SB 17 outlawed DEI offices, diversity statements, and discriminatory preferences at public universities and mandated state oversight of compliance. These are not the actions of one who stands "'able and ready' to apply for a vacancy in the reasonably imminent future," but of one who hopes to use "some day intentions" to "vindicate his view of the law." *Carney*, 592 U.S. at 64. And they are flatly inconsistent with the notion that Lowery faces an "imminent" threat of a concrete injury traceable to any challenged conduct of A&M. *See James*, 86 F.4th at 1081-82.

As to the second, the district court rightly distinguished Lowery's authorities—*Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656 (1993), and *Gratz v. Bollinger*, 539 U.S. 244 (2003)—because the plaintiffs in those cases "had at least applied to the

challenged program at some point in the past and intended to do so again,"
ROA.774, and there was no dispute that the challenged policies would both
(1) apply to the plaintiffs and (2) prevent equal competition. Unlike the racial set-
asides in *Associated General Contractors* or the race-conscious evaluation rubric
concededly used in *Gratz*, the policies and practices cited by Lowery—even taken
as true—would not affect him personally as an aspirational applicant to one
specific school at A&M (*i.e.*, Mays). *Cf. Gratz*, 539 U.S. at 265-66, 270; *Assoc'd
Gen. Contractors*, 508 U.S. at 658-59, 661.

Absent proof of both elements of the "able and ready" standard, what
remains is speculation (*i.e.*, "assum[ing] the conclusion" that "ongoing
discrimination exists and is injuring" the plaintiff). ROA.773. As the district court
correctly observed, by Lowery's logic, "any putative plaintiff could sue a potential
employer without ever applying, simply upon allegation the posited discriminatory
practices deterred application." *Id.* Lowery's rejoinder, that "[a] plaintiff must
allege (and eventually prove) that he stands 'able and ready to apply' for that job,"
Appellant's Br. 32, answers only half of the question. Article III requires injury in
fact, and if the claimed injury is competitive harm, there must be proof that the
plaintiff will actually or imminently suffer that injury. The issue, in other words, is
the existence of the discriminatory barrier—not just the plaintiff's status as "able
and ready" to apply. *See Assoc'd Gen. Contractors*, 508 U.S. at 666 ("To establish

standing, . . . a party challenging a set-aside program like Jacksonville's need only demonstrate that it is able and ready to bid on contracts ***and*** that a discriminatory policy prevents it from doing so on an equal basis." (emphasis added)).

The district court was rightly wary of Lowery's effort to relax that standard: Accepting Lowery's loose conception of Article III would drastically expand employment-discrimination litigation. Under Lowery's view, anyone in a protected class anywhere in the country would have standing to seek a wide-ranging injunction against any organization merely by asserting that he or she intends to apply for employment someday and pointing to some allegedly discriminatory statements or practices attributable to someone at the organization, without alleging or proving that any of those statements or practices would ever affect the plaintiff. The Supreme Court has cautioned against grounding federal jurisdiction on such abstract claims of injury. *See Allen v. Wright*, 468 U.S. 737, 755-56 (1984) (rejecting claim of stigmatic injury that would "extend [standing] nationwide to all members of the particular [protected] groups against which the Government was alleged to be discriminating . . . , regardless of the location" of the discriminatory conduct).

Consistent with this body of law, the cases finding standing for non-applicants are a narrow exception to the general rule, reserved for circumstances wholly unlike this case. "In order to satisfy the standing requirement of an 'actual

or imminent' injury, a plaintiff generally must submit to the challenged policy

before bringing an action to dispute it." *Davis v. Tarrant Cnty., Tex.*, 565 F.3d

214, 220 (5th Cir. 2009). "[S]trict adherence to this general rule may be excused,"

however, "when a policy's flat prohibition would render submission futile." *Id.*

Still, it is not enough to "speculate[]" or express doubt as to one's prospects; it

must be clear that an application would be denied. *See id.* at 220-21 (citing cases).

This is rightly a high bar—and one that Lowery did not come close to meeting.[2]

As the district court correctly found, Lowery failed in his burden to prove

that he faces an imminent threat of a concrete, particularized, and individualized

injury that is traceable to any unlawful conduct by A&M. But as the court also

recognized, in the hypothetical event that Lowery could make such a showing in the

future, nothing in the court's without-prejudice dismissal would prevent him from

---

[2]     *Cf. Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365-66 (1977)
("If an employer should announce his policy of discrimination by a sign reading
'Whites Only' on the hiring-office door, his victims would not be limited to the
few who ignored the sign and subjected themselves to personal rebuffs."); *Ellison
v. Connor*, 153 F.3d 247, 255 (5th Cir. 1998) ("It would have been futile in this
case for the Ellisons to apply for permits because the Corps sent them a letter on
October 10, 1995 specifically stating that it would not permit the construction or
placement of any structures on their land."); *Moore v. USDA*, 993 F.2d 1222,
1223-24 (5th Cir. 1993) (it was futile for applicants to complete a loan application
when the agency advised them in writing that the program excluded white people);
*see also Ellison v. Am. Bd. of Orthopaedic Surgery*, 11 F.4th 200, 206 (3d Cir.
2021) ("While futile gestures are not needed to establish standing, allegations of
futility alone do not necessarily suffice to show a concrete, particularized, and
actual or imminent injury.").

filing a new complaint at any time.  And, tellingly, even though SB 17 has been in effect for more than five months now, Lowery has never done so—presumably because his counsel could not make those allegations consistent with Rule 11.

## II.    THE DISTRICT COURT DID NOT ERR IN ALTERNATIVELY DISMISSING LOWERY'S CLAIMS AS MOOT AND UNRIPE.

For the reasons set forth above, this Court can affirm the district court's order solely on the basis that Lowery failed to prove his standing to seek injunctive relief.  But were that not enough, the district court also correctly held that the enactment of SB 17 rendered Lowery's claims both moot and unripe.

The district court accurately observed that "SB 17 prohibits exactly what Lowery alleges is taking place" at A&M.  ROA.777.  Indeed, the parties agree on that score.  ROA.821 (30:11-18).  As the district court acknowledged, this undisputed fact moots Lowery's claims based on past practices and renders his claims for prospective relief unripe.  ROA.777.

### A.    Lowery's Claims Based on Past Practices Have Been Mooted.

"Sometimes, events in the world overtake those in the courtroom, and a complaining party manages to secure outside of litigation all the relief he might have won in it.  When that happens, a federal court must dismiss the case as moot." *FBI v. Fikre*, 144 S. Ct. 771, 777 (2024).  Article III compels this result, as "federal judges are not counselors or academics . . . free to take up hypothetical questions that pique a party's curiosity or their own." *Id.*  To the contrary, "[t]he limited

39

authority vested in federal courts to decide cases and controversies means that they may no more pronounce on past actions that do not have any 'continuing effect' in the world than they may shirk decision on those that do." *Id.*

The Court need only look at Lowery's pleadings to confirm that SB 17 "provided the plaintiff[] the very relief [his] lawsuit sought." *Amawi v. Paxton*, 956 F.3d 816, 821 (5th Cir. 2020). In his first amended complaint, in addition to declaratory relief, Lowery demanded a permanent injunction barring defendants "from considering race or sex in the appointment, promotion, or compensation of [A&M's] faculty" and the appointment of a court monitor "to oversee all decisions relating to the appointment, promotion, and compensation of faculty" as well as "the 'diversity office'" at A&M. ROA.174-75 (¶ 66). Even if A&M previously believed that it could use diversity considerations as one factor among others in hiring decisions and even if Lowery had proved that he would suffer an imminent threat of concrete harm as a result—neither of which is true—SB 17 clearly and unequivocally bars those practices.

SB 17 requires the Regents of the A&M System to "ensure that" each unit of the system (including A&M) does not "establish or maintain a diversity, equity, and inclusion office" or "give preference on the basis of race, sex, color, ethnicity, or national origin to an applicant for employment, an employee, or a participant in any function of the institution." Tex. Educ. Code § 51.3525(b)(1)(A)-(D). The

Regents must also certify the A&M System's compliance with SB 17 annually to the Texas Legislature and the Texas Higher Education Coordinating Board, and any noncompliance—separately monitored by the state auditor—that is not cured within six months will cause a loss of state funding. *Id.* § 51.3525(e)-(g). And even before SB 17 went into effect, A&M had developed detailed procedures for complying with it. *See* ROA.399; Tex. A&M Univ. Sys. Policy No. 08-01, § 4.4.

Where, as here, the practices challenged in litigation are banned by intervening legislative action, claims for injunctive relief from those practices become moot. *See, e.g.*, *Daves v. Dallas Cnty., Tex.*, 64 F.4th 616, 633-34 (5th Cir. 2023) (en banc); *U.S. Navy SEALs 1-26 v. Biden*, 72 F.4th 666, 672-73 (5th Cir. 2023); *Freedom from Religion Found. v. Abbott*, 58 F.4th 824, 831-32 (5th Cir. 2023); *Amawi*, 956 F.3d at 821.

Lowery attempts to avoid mootness by casting the changes as acts of "voluntary cessation" and demanding evidence that A&M *will* comply with SB 17. Appellant's Br. 41-42, 44-45. As already shown, A&M never engaged in, and thus never could have "ceased," any practices that could have affected Lowery. But in any event, the voluntary cessation doctrine does not apply where, as here, "cessation" of allegedly improper conduct was compelled by force of law. *Daves*, 64 F.4th at 634; *see Envtl. Conservation Org. v. City of Dallas*, 529 F.3d 519, 528 n.4 (5th Cir. 2008) ("Federal courts have long-recognized that allegations by a

41

defendant that its voluntary conduct has mooted the plaintiff's case require closer examination than allegations that 'happenstance' or official acts of third parties have mooted the case."). *Daves* is instructive. There, the en banc Court held that "substantial changes made by the Texas legislature to procedures for assessing bail" mooted claims for injunctive relief from Dallas County's pretrial bail system. *Daves*, 64 F.4th at 633. Noting that the new law was "enacted after the initial panel decision in this case and pending our en banc review," this Court agreed with the district court that the plaintiffs' claims had become nonjusticiable. *Id.* at 633-34. "To rule on the status of S.B. 6 and its procedures at this point, based on evidence largely generated during proceedings that occurred pre-amendment," the Court wrote, "would constitute no more than an advisory opinion." *Id.* at 634. Moreover, the fact that the named plaintiffs did not have experience under the new law "calls into question their ability to pursue this litigation for ongoing injunctive relief as injured parties, much less class representatives." *Id.* As for the plaintiffs' efforts to resist mootness, the Court was unequivocal: "Voluntary cessation is not involved here," and the argument that the County's bail practices "remain unconstitutional irrespective of S.B. 6" is "incoherent" given that the statute "specifically requires" the very measures the plaintiffs sought. *Id.* at 634-35.

Lowery's response, that he "denies that the defendants intend to comply with SB 17," given what he paints as their continued expressions of support for

principles of diversity, equity, and inclusion, is misguided. Appellant's Br. 41.

First, "there is no requirement that a government actor renounce its prior conduct

in order to moot a case." *Boudreaux v. La. State Bar Ass'n*, 86 F.4th 620, 630 (5th

Cir. 2023). Second, even if this were a case of voluntary cessation, appellees

would enjoy a presumption of good faith as government agents. *Id.* While Lowery

avers that "university officials and employees are not entitled to [this]

presumption," Appellant's Br. 44, he overstates the import of *Speech First, Inc. v.*

*Fenves*, 979 F.3d 319 (5th Cir. 2020). There, this Court simply observed that "this

relaxed standard ***has not been applied*** to voluntary cessation by a public

university"—at least in the Fifth Circuit—then "assume[d] its applicability

arguendo" and found that it was not "absolutely clear" that the university would

not reinstate the challenged policies. *Speech First*, 979 F.3d at 328-29 (emphasis

added). As the Court recognized, other circuits have held that public universities

and their officials are presumed to act good faith to the same extent as other arms

of state government. *Speech First, Inc. v. Killeen*, 968 F.3d 628, 646 (7th Cir.

2020); *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 768 (6th Cir. 2019).

Contrary to Lowery's suggestion, the doctrine of *Ex parte Young*, 209 U.S.

123 (1908), does not "strip[]" government officials of the presumption of good

faith accorded to acts of voluntary cessation. Appellant's Br. 45. After all, the

purpose of that doctrine is to authorize suits against state officers in their official

43

capacity "for an injunction to stop ***ongoing*** violations of federal law." *Tex. Alliance for Retired Ams. v. Scott*, 28 F.4th 669, 671 (5th Cir. 2022) (emphasis added); *see also James*, 86 F.4th at 1083 (allegations of past harm are "insufficient to show an ongoing violation of federal law" under *Ex parte Young*); *Williams ex rel. J.E. v. Reeves*, 954 F.3d 729, 737 (5th Cir. 2020) ("[T]o comply with the dictates of *Ex parte Young*, plaintiffs' lawsuit must allege that the defendants' actions are ***currently*** violating federal law.").

### B.    Lowery's Claims for Prospective Relief Are Unripe.

Dismissal for ripeness is appropriate when a case is "abstract or hypothetical," as when "the purported injury is 'contingent [on] future events that may not occur as anticipated, or indeed may not occur at all.'" *Lopez v. City of Houston*, 617 F.3d 336, 341-42 (5th Cir. 2010). The district court acknowledged that A&M had submitted evidence "indicating that [it] ha[d] already begun its efforts to comply with SB 17," ROA.777, and reasoned that "further factual development is plainly required before the scope of injunctive relief—if any— would be fit for judicial review," ROA.779.

Lowery insists that the landscape has not changed, reiterating his conclusory allegation that A&M has "willfully disregarded" federal antidiscrimination law "for decades," including "after the enactment of SB 17." Appellant's Br. 43-44. This ignores the university's compliance review, ROA.399, as well as the A&M

System's updated Policy 08-01 implementing SB 17, *see supra* at 16, both timed to

predate the January 1, 2024 effective date of the new law.  As of today, the

possibility that A&M will engage in conduct proscribed by SB 17, and will do so

in a manner that harms Lowery, is "pure conjecture."  *Boudreaux*, 86 F.4th at 631.

Allegations of past conduct do not suffice, as "[a] plaintiff has no standing to seek

prospective relief merely on the basis of being 'once bitten.'"  *Id.* at 630 (internal

quotation marks omitted).  And, of course, Lowery was never "bitten" even once.

What matters is the current outlook, and on that front, the record is necessarily

underdeveloped.  *See Trump*, 592 U.S. at 131-34 (challenge to presidential

memorandum regarding census issues was unripe because "this case is riddled with

contingencies and speculation," including the prospect that "the policy may not

prove feasible to implement in any manner whatsoever, let alone in a manner

substantially likely to harm any of the plaintiffs"); *Veasey v. Abbott*, 796 F.3d 487,

497 n.7 (5th Cir. 2015) (issue of new law's effect was unripe where agency had yet

to release implementing regulations), *on reh'g en banc*, 830 F.3d 216 (5th Cir.

2016); *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 547 (5th Cir. 2008)

("Further factual development, as well as an actual policy contrary to the statute,

would enhance this case's fitness for judicial review.").

Moreover, even accepting Lowery's abstract framing of the issues as "pure

questions of law," Appellant's Br. 43, ripeness still requires proof of hardship to

45

the plaintiff from deferring judicial review. *Choice Inc. of Tex. v. Greenstein*, 691

F.3d 710, 715 (5th Cir. 2012). The record lacks any such evidence, and the only

hardship that Lowery even attempts to articulate is his own refusal to submit an

application to A&M, Appellant's Br. 43 (citing ROA.308), based on a "fear[] of

hypothetical future harm that is not certainly impending," *Clapper*, 568 U.S. at

416. Article III requires more. *See Choice Inc.*, 691 F.3d at 715-16 (rejecting

claim of hardship where plaintiff "has not identified a single concrete example of

how it has been forced to modify its behavior as a result of" the challenged

statute). And Lowery also has the right, even today, to file a new case if he can

plausibly allege a current violation by A&M of SB 17 and federal law that will

imminently cause him concrete and particularized harm. But as already noted, he

has not exercised—and, under Rule 11, likely cannot exercise—that right.

The fact that SB 17 had not even gone into effect when the district court

ruled lends further support to the court's ripeness finding. The court reasoned that,

because A&M's efforts to comply with SB 17 had only just begun, "further factual

development is plainly required before the scope of injunctive relief—if any—

would be fit for judicial review." ROA.779. Now that SB 17 is fully effective,

that need for factual development is even more apparent. Any new complaint by

Lowery—which he is free to file—would have to consider A&M's ***actual***

compliance with the law. And as A&M's compliance review and the revisions to

46

A&M System Policy 08-01 suggest, when SB 17 became effective in January 2024, the A&M System took extensive action to implement the law, including, among other things: (1) developing centralized and standardized procedures to track and remediate any alleged violations of SB 17; (2) charging the A&M Division of Risk, Ethics, and Compliance with stewarding the compliance process; (3) publishing guidance on the effect of SB 17 on all aspects of university operations, from faculty recruitment to course instruction to post-graduate outcomes; and (4) issuing an operational manual on DEI compliance that covers system-level and member-level processes for monitoring, reporting, and enforcement. *See DEI Compliance Page*, Tex. A&M Univ. Sys. (https://tinyurl.com/yc2h256z).  While those facts, by their nature, are not in the record because they arose after SB 17 became effective—months after the district court's dismissal—they nevertheless are strongly indicative of the correctness of the court's holding that further factual development would be needed before Lowery's claims could be ripe.

This Court's words in *Boudreaux* are apt:  "If someday in the future [A&M] appears to violate [Lowery's] rights, he is more than welcome to bring a lawsuit. But until he is actively being aggrieved—or faces the imminent threat of illegal actions—his claim[s] [are] not justiciable." *Boudreaux*, 86 F.4th at 631.

### III.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY DECIDING THE RULE 12(B)(1) MOTION ON THE EXISTING RECORD.

"A district court may dismiss a case under Rule 12(b)(1) based on '(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'" *S. Recycling*, 982 F.3d at 379.  The district court correctly construed appellees' motion as a factual attack on subject-matter jurisdiction and properly resolved disputes of fact bearing on the existence of federal jurisdiction based on the record before it.

Citing *Williamson*, Lowery makes the categorical assertion that "a court cannot resolve a factual challenge to its subject-matter jurisdiction without first affording the plaintiff an opportunity for discovery into the facts relevant to jurisdiction."  Appellant's Br. 40.  But *Williamson* is clear that the "opportunity" is context-specific:  "Insofar as the defendant's motion to dismiss raises factual issues, the plaintiff should have an opportunity to develop and argue the facts ***in a manner that is adequate in the context of the disputed issues and evidence***."  *Williamson*, 645 F.2d at 414 (emphasis added).  The "disputed issues and evidence" Lowery references in this section of his brief relate solely to standing.  *See* Appellant's Br. 40.  Accordingly, if this Court affirms the district court's alternative mootness and ripeness holding, Lowery's discovery argument would

itself be moot.  In any event, given the nature of appellees' factual challenge, focusing on Lowery's claimed injury in fact, Lowery had ample opportunity to "develop and argue" the relevant facts.  *Williamson*, 645 F.2d at 414.  Indeed, he executed a declaration intended to substantiate his interest in A&M and his asserted reasons for deferring an application (*i.e.*, the factual basis for his purported Article III injury), and submitted five supplemental notices to the district court.

Any "opportunity" beyond that was waived.  Lowery agreed to stay discovery pending a ruling on appellees' motion to dismiss, ROA.129, and he neither petitioned the court to vacate its order enforcing that agreement nor served a single discovery request on appellees.  His broad allusions to discovery at the motion-to-dismiss hearing and in his supplemental briefing and notices did not suffice, as he never specified the discovery he sought and indicated, at most, that he wanted to fish for evidence bearing on mootness.  *See* ROA.823 (32:9-17); ROA.401; ROA.614; ROA.657.  This was not for lack of direction; Lowery received a wealth of information from a disgruntled professor at Mays and leveraged A&M's status as a public university to mine for evidence of university policies and remarks by faculty and administrators.  Lowery is bound by the consequences of his failure to take any formal action to compel discovery during the nearly eight months that appellees' motion to dismiss was pending.  *See United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1280-81 (11th Cir. 2009) (district court did

not abuse its discretion by dismissing case for lack of personal jurisdiction rather than deferring a ruling and granting plaintiff's "'requests' for jurisdictional discovery," where plaintiff "never formally moved the district court for jurisdictional discovery but, instead, buried such requests in its briefs as a proposed alternative to dismissing [defendant] on the state of the current record").

Regardless, "[t]he party seeking discovery bears the burden of showing its necessity," and he "typically meets this burden by alleging the 'specific facts crucial to [jurisdiction] which demonstrate[] a need for discovery.'" *Freeman*, 556 F.3d at 341-42 (third alteration in original). If the plaintiff cannot make this showing—as by "articulat[ing] a discrete discovery request that might cure the jurisdictional deficiency"—or if "the record shows that the requested discovery is not likely to produce the facts needed to withstand a Rule 12(b)(1) motion," the district court does not abuse its discretion by deciding the motion on the existing record. *Id.* at 342-43; *see also S. Recycling*, 982 F.3d at 386 (district court's ruling denying discovery and dismissing case for lack of subject-matter jurisdiction was not "arbitrary or clearly unreasonable" where petitioner "ha[d] not shown why it needed further discovery or what material evidence further discovery could have produced that was not already available to it"). Lowery did not even attempt to make that showing below and does not do so on appeal either.

Accordingly, even if Lowery had not waived any discovery in connection with appellees' motion, he failed to articulate any specific discovery that would cure the jurisdictional deficiencies in his complaint.  The district court therefore did not abuse its discretion in deciding the dismissal motion on the existing record.  *See S. Recycling*, 982 F.3d at 386; *see also United Techs.*, 556 F.3d at 1281 ("'The district court . . . did not so much deny discovery as it dismissed the case before discovery was taken.  We cannot say that the district court erred,' much less abused its discretion." (citation omitted)).

## IV.    THE DISTRICT COURT DID NOT ERR BY DENYING LEAVE TO FILE AN AMENDED OR SUPPLEMENTAL COMPLAINT.

An amended pleading "relate[s] to matters that occurred prior to the filing of the original pleading and entirely replace[s] the earlier pleading," whereas a supplemental pleading "deal[s] with events subsequent to the pleading to be altered and merely represent[s] additions to or continuations of the earlier pleading." *Dean v. Ford Motor Credit Co.*, 885 F.2d 300, 302 (5th Cir. 1989) (quoting 6 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1504 (1971)).  Different rules apply to amendment and supplementation.

Rule 15(a), governing amended pleadings, says that courts "should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "Though that's a generous standard, 'leave to amend can be properly denied when there is a valid justification.'"  *Robertson v. Intratek Comput., Inc.*, 976 F.3d 575, 584 (5th Cir.

2020).  Valid justifications include undue delay, bad faith, dilatory motive, and futility.  *New Orleans Ass'n*, 56 F.4th at 1034.  "The district court also may consider 'whether the facts underlying the amended complaint were known to the party when the original complaint was filed.'"  *Robertson*, 976 F.3d at 584.

Rule 15(d), governing supplemental pleadings, does not direct courts to "freely give leave," but rather provides that "the court may, on just terms, permit" supplementation.  Fed. R. Civ. P. 15(d).  Given that Rule 15(d) lacks any statement that leave to supplement must be "freely give[n]," the "standard of review for denials based on futility under Rule 15(a) and 15(d) may be different."  *Hoggatt v. Allstate Ins.*, 849 F. App'x 74, 77 (5th Cir. 2021) (per curiam).  But there is no need to resolve that issue now, because the district court's decision to deny leave should be affirmed regardless of the standard applied.

After the motion-to-dismiss hearing, Lowery requested leave to file what he styled a "second amended complaint" in order to "add factual allegations showing that an Article III case or controversy continues to exist despite" SB 17 and *Students for Fair Admissions*.  ROA.512.  He confirmed that he was "not amending any of his allegations related to Article III standing, sovereign immunity, or his supposed failure to state a claim on which relief may be granted," and he denied that appellees would be prejudiced "because the new allegations concern only whether the case has become moot."  ROA.513.

All but one of Lowery's new allegations concerned events postdating his first amended complaint; the lone exception was his portrayal of the Mays dean-search committee in October 2022. The district court held that Lowery's proposed amendments would be futile because "[t]hey do nothing to overcome the above conclusions with respect to ripeness and standing." ROA.781.

This was no abuse of discretion. By Lowery's own account, the new allegations were directed exclusively at mootness. ROA.513. He has reaffirmed that position on appeal, Appellant's Br. 46, and thus forfeited any argument otherwise. *New Orleans Ass'n*, 56 F.4th at 1034-35. Accordingly, if the Court affirms the district court's without-prejudice dismissal for lack of standing, the amendment issue, too, would become moot. Regardless, because the proposed pleadings would not cure the defects in subject-matter jurisdiction, the district court did not err in denying leave. *Id.*; *see also Lewis v. Knutson*, 699 F.2d 230, 239-40 (5th Cir. 1983) (district court did not err in denying leave to supplement where, *inter alia*, plaintiff filed his motion five months after the subject events and his new allegations failed to cure the standing defect raised in the motion to dismiss). The court acted well within its discretion in finding that the proposed new allegations—which consisted merely of generalized accusations that A&M intended not to comply with SB 17 and summaries of the material in Lowery's notices, *see* ROA.528-31—reinforced the speculative and premature nature of

Lowery's claims.  As the court explained, "[t]he proposed amendments simply reiterate much of what Lowery has included in supplemental briefing" and "do nothing to overcome" the justiciability defects because "what's lacking is actual implementation and experience under the law as now proscribed."  ROA.781.

Moreover, the record also indicates that at least some of the information presented in the proposed second amended complaint was available to Lowery when he filed his first amended complaint, ROA.717, raising questions about the strategic timing of the amendment and further justifying denial of leave.  *See Robertson*, 976 F.3d at 584 (district court did not err in denying leave to amend where plaintiff's motion "was an untimely 'tactical maneuver'" intended to challenge an unfavorable ruling, and the proposed amendment was based on facts known to plaintiff before filing suit).

Finally, Lowery suffered no prejudice from the district court's ruling, given that he seeks only prospective injunctive relief and the court made clear that Lowery remains free, at any time, to file a new complaint should he be able to plausibly allege facts showing both Article III jurisdiction and a current, ongoing violation of law.  *Cf. Flynn v. FCA US LLC*, 39 F.4th 946, 954 (7th Cir. 2022) (district court that finds no standing "may either dismiss without leave to amend or dismiss without prejudice").  The fact that Lowery still has not availed himself of this opportunity is further indication that there was no error in denying leave.

54

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted,

*/s/ Layne E. Kruse*
Layne E. Kruse
M. Carter Crow
NORTON ROSE FULBRIGHT US LLP
1301 McKinney, Suite 5100
Houston, TX 77010
(713) 651-5194

Paul D. Trahan
Ryan E. Meltzer
NORTON ROSE FULBRIGHT US LLP
98 San Jacinto Blvd., Suite 1100
Austin, TX 78701-4255
(512) 536-5234

Jonathan S. Franklin
NORTON ROSE FULBRIGHT US LLP
799 9th Street N.W., Suite 1000
Washington, DC 20001
(202) 662-0466

May 10, 2024                              *Counsel for Defendants-Appellees*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 10, 2024, the foregoing document was electronically filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit via the Court's CM/ECF system.  Counsel for all parties to the case are registered CM/ECF users and will be served by the CM/ECF system.

Dated:  May 10, 2024                        */s/ Layne E. Kruse*
                                            Layne E. Kruse
                                            *Counsel for Defendants-Appellees*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Fed. R. App. P.

32(a)(7)(B) because it contains 12,998 words, excluding the parts of the brief

exempted by Fed. R. App. P. 32(f).  This brief complies with the typeface

requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R.

App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface

using Microsoft Word 2010 in 14-point Times New Roman typeface.


Dated:  May 10, 2024                    */s/ Layne E. Kruse*_____
                                        Layne E. Kruse
                                        *Counsel for Defendants-Appellees*